# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**13-1365**


**STATE OF LOUISIANA**

**VERSUS**

**ALCIDE HYPOLITE**


**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. CR 136613
HONORABLE MARILYN CARR CASTLE, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**SHANNON J. GREMILLION**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Elizabeth A. Pickett, Shannon J. Gremillion, and Phyllis M. Keaty, Judges.


**AFFIRMED.**


**Michael Harson**
**District Attorney, Fifteenth Judicial District Court**
**Patrick D. Magee**
**Assistant District Attorney**
**P.O. Box 3306**
**Lafayette, LA 70502-3306**
**(337) 232-5170**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Edward Kelly Bauman**
**Louisiana Appellate Project**
**P. O. Box 1641**
**Lake Charles, LA 70602-1641**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT/APPELLANT:**
> **Alcide Hypolite**

**Alcide Hypolite**
**Spruce 1**
**Louisiana State Prison**
**Angola, LA 70712**
**PRO SE:**
> **Alcide Hypolite**

**GREMILLION, Judge.**

Defendant, Alcide Hypolite, was accused of raping his ten-year-old granddaughter, T.J., while she was spending the night at his home.[1] He was charged by grand jury indictment with one count of aggravated rape, a violation of La.R.S. 14:42. After a trial by jury, Defendant was found guilty as charged. Defendant was sentenced to the mandatory sentence of life imprisonment without benefit of probation, parole, or suspension of sentence. Defendant is now before this court alleging several attorney-filed and pro se assignments of error. For the following reasons, Defendant's conviction and sentence are affirmed.

## SUFFICIENCY OF THE EVIDENCE

A finding of insufficiency would require reversal of the conviction and, thus, obviate the need for discussion of the other assignments of error. *See State v. Hearold*, 603 So.2d 731 (La.1992).

Despite the fact that the victim's testimony supported the elements of the crime of aggravated rape, Defendant attacks the sufficiency of the evidence. Basically, appellate counsel attacks the credibility of the victim. For the reasons that follow, we find that this assignment lacks merit.

This court has stated the following regarding the standard for reviewing a claim of insufficient evidence:

> The standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger,* 05–11, p. 91 (La.7/10/06), 936 So.2d 108, 170, *cert. denied,* 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007) (citing *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61

---

[1] Pursuant to La.R.S. 46:1844(W), the victim's initials are used throughout to protect her identity. Later in the opinion, initials are also used to protect the identity of an alleged victim who is also minor.

L.Ed.2d 560 (1979); *State v. Captville,* 448 So.2d 676, 678 (La.1984)). The *Jackson* standard of review is now legislatively embodied in La.Code Crim.P. art. 821. It does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford,* 05–477, p. 6 (La.2/22/06), 922 So.2d 517, 521 (citing *State v. Robertson,* 96–1048 (La.10/4/96), 680 So.2d 1165; *State v. Lubrano,* 563 So.2d 847, 850 (La.1990)). The appellate court's function is not to assess the credibility of witnesses or reweigh the evidence. *State v. Smith,* 94–3116 (La.10/16/95), 661 So.2d 442.

The factfinder's role is to weigh the credibility of witnesses. *State v. Ryan,* 07–504 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268. Thus, other than ensuring the sufficiency evaluation standard of *Jackson,* "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *Id.* at 1270 (quoting *State v. Lambert,* 97–64, pp. 4–5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 726–27). Our supreme court has stated:

> However, an appellate court may impinge on the fact finder's discretion and its role in determining the credibility of witnesses "only to the extent necessary to guarantee the fundamental due process of law." *State v. Mussall,* 523 So.2d 1305, 1310 (La.1988). In determining the sufficiency of the evidence supporting a conviction, an appellate court must preserve "'the factfinder's role as weigher of the evidence' by reviewing 'all of the evidence . . . in the light most favorable to the prosecution.'" *McDaniel v. Brown,* 558 U.S. [120], [134], 130 S.Ct. 665, 674, 175 L.Ed.2d 582 (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). When so viewed by an appellate court, the relevant question is whether, on the evidence presented at trial, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789. Applied in cases relying on circumstantial evidence, . . . this fundamental principle of review means that when a jury "reasonably rejects the hypothesis of innocence presented by the defendant[ ], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *State v. Captville,* 448 So.2d 676, 680 (La.1984).

*State v. Strother,* 09–2357, pp. 10–11 (La.10/22/10), 49 So.3d 372, 378 (alteration in original).

*State v. Francis*, 12-1221, pp. 6-7 (La.App. 3 Cir. 4/3/13), 111 So.3d 529, 533, *writ denied*, 13-1253 (La. 11/8/13), 125 So.3d 449.

Although many witnesses testified for the State, the only eyewitness to testify was the victim herself, T.J. The victim was fifteen years old at the time of trial. At the time of the offense, however, the victim was ten years old. The victim testified that Defendant is her grandfather. While the victim was spending the night at Defendant's house on January 31, 2009 (the night before the Super Bowl), Defendant went into the room where the victim was sleeping, took off the victim's pants and panties, and started touching her vagina. The victim could not remember if Defendant touched her breasts. During her Stuller Place pre-trial interview, however, the victim indicated that Defendant did touch her on her breasts. When asked at trial what else he tried to do to her vagina, the victim stated that Defendant "kissed it and tried to stick his private in . . . [her] vagina." According to the victim, when Defendant tried to stick his private in her vagina, she jumped and tried to close her legs.

The victim admitted that she told both the doctor and her interviewer at Stuller Place that Defendant did not penetrate her. During her Stuller Place interview, the victim stated that Defendant tried to put his "thing" in her private part, but she kept her legs closed. When specifically asked by the Stuller Place interviewer if Defendant put his private part in her private part, the victim said "no." At trial, the victim explained that when she was ten years old, she did not understand the meaning of "penetrate." The victim further explained:

Q: What did you think they meant when you were 10 years old?

A: I thought they meant if he had went in all the way.

Q: Went what?

3

A: Into my vagina all the way.

Q: All the way? Now - - So, when you said, no, he didn't penetrate you, you meant, no, his whole penis was not inserted in your vagina?

A: Yes, sir.

Q: Is that fair?

A. (Nodded head "Yes").

Q: Okay. Did some of it go in?

A: Yes, sir.

Q: But not the whole thing?

A: Not the whole thing.

The victim testified that she told her mom about the rape the next day when Defendant left. The victim testified that she cried and that she realized something wrong had happened to her.

On cross-examination, the victim testified that when the incident occurred, she was sleeping in a big room with about six other children present. The victim's mom was sleeping down the hall, about two or three doors down. According to the victim, another person was sleeping about a foot away from her. During the incident, the victim testified, none of the other kids woke up.

The victim's mom, Mia Barnes, testified that on the morning of February 1, 2009, she knew something was wrong with the victim. When Ms. Barnes asked the victim what was wrong, the victim responded, "Paw-paw raped me." Ms. Barnes immediately told her stepmother, Earlette. Earlette called Defendant and told him to come home, while Ms. Barnes called 911. Thereafter, "they" went to Our Lady of Lourdes Hospital.

4

On cross-examination, defense counsel asked Ms. Barnes if any of the other children present at Defendant's home said anything to her that morning. Ms. Barnes responded:

A: [B.D.] ran up to - - [B.D.] ran up to me and told me that happened to her, too.

Q: Okay. That same night?

A: That same morning.

Q: That the same thing happened to her as had happened to - -

A: [T.J.]. But not in that night.

Ms. Barnes also stated that Earlette ran a daycare in her home, and Defendant was present while Earlette was babysitting the kids. When asked if the victim always told the truth, Ms. Barnes replied, "Yes." Ms. Barnes also testified that Defendant had been around the victim several times prior to the incident. At the time of the incident, Ms. Barnes stated that there was no tension in her relationship with Defendant. On re-direct examination, Ms. Barnes testified that the victim never told her that anyone else "did anything like this to her[.]"

Detective Nicole Benoit testified that she investigated the victim's allegation of rape. Detective Benoit went to Our Lady of Lourdes Hospital and briefly spoke with the victim. According to Detective Benoit, the victim was very quiet, withdrawn, and crying. Detective Benoit explained that she took a sample of Defendant's saliva with two cotton swabs. Detective Benoit also obtained a sample of the victim's saliva with two cotton swabs. Defendant, Detective Benoit testified, gave permission for the collection of his blood, urine, hair, saliva, nail scrapings, and/or his clothing. Detective Benoit also discussed the fact that vaginal swabs and smears were taken from the victim. Detective Benoit explained that she

5

personally took the swab of the victim's saliva, but all of the victim's other swabs were taken by the doctors.

Dr. Charles Burnell testified as an expert in the field of emergency medicine. Dr. Burnell examined the victim on February 1, 2009. According to Dr. Burnell, his examination revealed scratches within the victim's right inner thigh area, but he saw no evidence of seminal fluid or pubic hair. Dr. Burnell explained that the victim did have her own pubic hair. Dr. Burnell did not find evidence of any trauma to either the anus or the vagina. In order to obtain a pure sample and find out if there was any ejaculation or penetration, Dr. Burnell performed an internal vaginal exam. No swab was taken from the outer edges of the victim's vagina. Dr. Burnell explained that a very small speculum is used to look inside and separate the walls of the vagina. Then, a swab is taken from inside the vaginal vault. Dr. Burnell explained further:

> Typically, we try to get all the way down to the cervix and swab around what's call [sic] the fornices, which are either side of the cervix, where the horns of the uterus go out.

> And we obtain fluid from deep in that area, just because we know that that area is very difficult to introduce any foreign material without penetration.

> . . . .

> That's why I say, you want to make sure that you do get a pure sample. So that Q-tip is inserted deep within the vaginal vault.

Dr. Burnell also explained that the victim did have a vaginal opening, but there was no evidence of an acute tear of the hymen. Dr. Burnell described "acute" as being within the last twenty-four hours, and explained that there was no evidence of an "acute" violation of the victim's tissue. When asked if his findings meant that nothing penetrated the victim "that deep," Dr. Burnell replied:

6

A: No. The hymen was not intact. This child did not have a hymen. This child - - This child could have been penetrated more deeply.

. . . .

A: - - the hymen is disrupted, and they actually have the introitus is open. It's able to be penetrated.

And this child was without an intact hymen. She obviously could have been penetrated. But it did not show any gross evidence of a traumatic - -

Q: Traumatic.

A: - - penetration at that time, no, sir.

According to Dr. Burnell, it is not uncommon for a child the age of the victim to not have an intact hymen. When asked to describe the victim's demeanor, Dr. Burnell stated that the victim was a "fairly good historian," had a believable story, and answered questions appropriately.

On cross-examination, Dr. Burnell testified that the scratches on the victim's thighs were superficial and consistent with what looked like fingernail marks. When asked if there would have been evidence of penetration if the victim's vagina had been penetrated, Dr. Burnell responded:

A: No, sir.

Q: Okay. Could you explain why you say so.

A: Well, depending on, obviously, a lot of factors, including the size of the vaginal orifice or the actual size of the vaginal entry, the size of the penis of the perpetrator. These things really play a factor in whether or not you truly have a tear. I mean, it's just a matter of simple physics.

Q: Okay.

A: As far as, you know, forceful penetration or non-forceful penetration, very difficult to tell. A 10-year-old child - - And I don't remember this young lady's exact weight. But a 10-year-old child sometimes, from - - the ability to accommodate a normal male penis, would be able to, without having significant trauma inflicted.

7

That's kind of borderline, when you look at prepubertal females. Those sometimes are difficult to tell whether or not there had been any foul play, because there's not a mismatch, as if it would have been a two-year-old child with an introitus and possibly an intact hymen. But the introitus would have been much too small to accommodate a full-size male penis.

Finally, Dr. Burnell testified that he specifically asked the victim if she had been penetrated anally or vaginally, and the victim said "no."

Amy Winters testified as an expert in forensic DNA analysis. While working at Orchid Cellmark, Ms. Winters received evidence from the Acadiana Crime Lab. Ms. Winters received two samples for DNA processing including a vaginal swab from the victim and a known reference sample from Defendant. According to Ms. Winters, sperm cells extracted from the vaginal swab matched the profile generated from Defendant's sample. During cross-examination, Ms. Winters stated that she could not testify as to whether penetration or how much penetration occurred. Rather, she could only testify that she found sperm on the vaginal swabs taken from "the child's" vagina.

When asked about the "minor contributor" in the sperm extraction mentioned in her report, Ms. Winters stated that the minor contributor cannot be determined. Ms. Winters opined that the minor contributor was likely "that of the victim's profile that has spilled over or carried over into the non-sperm fraction." Ms. Winters explained:

> Because what I was saying earlier is, I start with one sample, and, during my process, I will separate one portion of the sample, and that becomes the non-sperm fraction, which should not contain any sperm cells.
>
> And then the other fraction is the sperm cell fraction. It should only contain sperm cells, but, because this is a separation technique, it is quite possible that some of the victim's DNA is present in that sperm cell fraction.

Later, defense counsel asked Ms. Winters if the "minor contributor" could have come from someone else touching the victim. Ms. Winters responded:

A: No, that's not consistent with that.

Q: And why not?

A: Because, the way the sample was collected and preserved and tested, it's not likely that it is contamination. It is most likely that it is simply a portion of the victim's DNA that is showing up in the sperm fraction.

Q: Not likely, or impossible?

A: I would say it's not likely.

Q: Okay. So it's - -

A: But, I mean, it's highly unlikely.

Q: So it is possible?

A: It is possible for someone else's DNA to be there, but I don't have any reason to believe that is someone else's.

Defense counsel also questioned Ms. Winters as to whether DNA could be deposited by simply touching something or brushing up against something. Ms. Winters stated that it was possible, but not as likely as finding DNA in items saturated in blood.

Winnie Kurowski also testified as an expert in the field of forensic DNA analysis. Ms. Kurowski worked for the Acadiana Crime Lab and received the sexual assault kit compiled in this case. Ms. Kurowski also received two cotton swabs of Defendant's saliva. From the rape kit, Ms. Kurowski received vaginal swabs. According to Ms. Kurowski, the evidence was sent to Orchid Cellmark for testing, and Orchid Cellmark then sent an analysis report back. From Orchid Cellmark's analysis, Ms. Kurowski was able to come up with a statistical analysis.

Ms. Kurowski determined with a reasonable degree of scientific certainty that Defendant was the source of the DNA profile from the sperm fraction of the vaginal swab. Ms. Kurowski also determined that the DNA profile obtained from the epithelial fraction of the vaginal swab matched the DNA profile from the victim's reference sample. Ms. Kurowski explained that epithelial cells are usually the victim's vaginal cells but sometimes can be a mixture of the vaginal cells and the suspect's non-sperm cells.

B.D., age sixteen, testified that Defendant is her mom's ex-husband. B.D. identified Defendant in court. B.D. testified that Defendant started raping her when she was seven or eight years old and did not stop until she was twelve. When asked if she knew what rape was, B.D. testified "forced sex." When asked if Defendant "st[u]ck his penis into [her] vagina," B.D. responded, "Yes, sir." B.D. testified that this happened a lot and that it happened once when other kids were in the room sleeping. B.D. stated that she told her fourth-grade teacher what was happening, and the police and her mom were called. At that time, B.D. was removed from Defendant's home. When asked if she ever told people that Defendant did not rape her, B.D. stated that she changed her story because her mom told her to. B.D. was put back into Defendant's house. When B.D. again told her mom that Defendant was raping her, her mom told her not to go in her room while her mom was at work.

In brief, Defendant claims that the evidence was insufficient to convict him of aggravated rape. After reciting the elements of aggravated rape, appellate counsel argues the following:

> Alcide Hypolite's DNA was found on T.J. No one can say how it was deposited. T.J. told Ms. Picard at Stuller Place that Alcide did not put his penis inside of her. Dr. Burnell noticed no evidence of

10

seminal fluid or pubic hair during his examination of T.J. During the examination Dr. Burnell "specifically asked her if she had any anal penetration, and she said no. I asked her if she had any vaginal penetration, she said no." Although it appeared T.J. knew exactly what Ms. Picard and Dr. Burnell were asking, after questioning by the State she claimed at trial she did not know what they were asking when they said, did he penetrate you?

For these reasons, appellate counsel asks this court to reverse Defendant's conviction and remand for further proceedings. Alternatively, appellate counsel asks this court to modify the verdict and render a judgment of molestation of a juvenile or sexual battery "in light of the victim's testimony that there was no penetration."

The State argues that in addition to hearing the testimonies of the victim and B.D., the jury heard expert testimony from Dr. Burnell, Ms. Winters, and Ms. Kurowski. Dr. Burnell, the State argues, testified that no sperm was found on the exterior of the victim. An internal vaginal exam of the victim, however, discovered sperm containing Defendant's DNA. The State concludes that this evidence proved beyond a reasonable doubt that Defendant penetrated the victim and left some of his seminal fluid inside of her vagina.

The crime for which Defendant was convicted, aggravated rape, is defined in pertinent part as follows:

> A. Aggravated rape is a rape committed upon a person sixty-five years of age or older or where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
>
> . . . .
>
> (4) When the victim is under the age of thirteen years. Lack of knowledge of the victim's age shall not be a defense.

La.R.S. 14:42.

Rape is defined by La.R.S. 14:41(A) as "the act of anal, oral, or vaginal sexual intercourse with a male or female person committed without the person's lawful consent." Louisiana Revised Statutes 14:41(B) further provides that "[e]mission is not necessary, and any sexual penetration, when the rape involves vaginal or anal intercourse, however slight, is sufficient to complete the crime."

It is well-settled that a victim's testimony alone is sufficient to support a verdict as long as that testimony was believed by the trier of fact and that testimony does not contain internal contradictions or irreconcilable conflicts with physical evidence:

> A victim's or witness's testimony alone is usually sufficient to support the verdict, as appellate courts will not second-guess the credibility determinations of the fact finder beyond the constitutional standard of sufficiency. *State v. Davis*, 02-1043, p. 3 (La. 6/27/03); 848 So.2d 557, 559. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the fact finder, is sufficient support for a requisite factual conclusion. *State v. Robinson*, 02-1869, p. 16 (La. 4/14/04); 874 So.2d 66, 79.

*State v. Dorsey*, 10-216, pp. 43-44 (La. 9/7/11), 74 So.3d 603, 634, *cert. denied*, ___ U.S. ___, 132 S.Ct. 1859 (2012).

In this case, the jury heard the victim testify that Defendant "tried to stick his private in . . . [her] vagina." When he did so, the victim jumped and tried to close her legs. The victim also testified that some of Defendant's penis went in but not the whole thing. The jury also heard Dr. Burnell's testimony that the victim said Defendant did not penetrate her and heard the Stuller Place interview where the victim specifically answered "no" when asked if Defendant put his private part in her private part. At trial, the victim explained that she told the Stuller Place interviewer and the doctor that Defendant did not penetrate her because she did not understand the meaning of penetration at that time. At the time the victim spoke to

12

the interviewer and the doctor, she was ten years old and believed that "penetration" meant that Defendant's penis went all the way into her vagina. Thus, when the victim told the interviewer and the doctor that Defendant did not penetrate her, she meant that Defendant's whole penis was not inserted into her vagina. We note that the Stuller Place interviewer did not use the word "penetrate." Thus, the victim's trial explanation as to her misunderstanding of the word "penetrate" did not explain why she told the Stuller Place interviewer "no" when asked if Defendant put his private part into her private part.

As this court explained in *State v. Bender*, 598 So.2d 629, 636 (La.App. 3 Cir.), *writ denied*, 605 So.2d 1125 (La.1992):

> When a witness is impeached, this simply means the jury, as the trier of fact, was presented with evidence which it could consider and weigh in determining the credibility, or believability, of a witness. Simply because the witness may have been impeached by prior inconsistent statements does not mean that the jury was prohibited from believing anything said by the witness. The inconsistencies in the witness's statements are one of any number of factors the jury weighs in determining whether or not to believe a witness's trial testimony.

At trial, the victim clearly testified that Defendant stuck a portion of his penis into her vagina. The jury was able to weigh this testimony against the victim's inconsistent pre-trial statements and her explanation for the inconsistencies. Obviously, the jury chose to believe the victim's trial testimony.

Furthermore, the jury heard expert DNA testimony that corroborated the victim's trial testimony. Both of the DNA experts testified that DNA extracted from sperm found on a vaginal swab taken from the victim matched Defendant's DNA profile. The jury also heard Dr. Burnell's testimony that the vaginal swab taken from the victim was taken from deep within the "vaginal vault" and that no swab was taken from the exterior of the victim's vagina. In brief, appellate

13

counsel suggests that Defendant's DNA could have been left behind by Defendant tucking the victim in after having sex with his wife. There was no testimony, however, that Defendant tucked the victim in after having sex with his wife. The reference cited by appellate counsel was defense counsel's opening statement where defense counsel argued:

> And he'll admit, I touched my granddaughter. That's my granddaughter. And he'll admit, I had sex with my wife. And, afterwards, when I got up, my granddaughter was sleeping, I covered her up. He'll admit those things.
>
> Did he wipe his hands clean? He wiped it with a dry towel. DNA, as you'll hear, can transfer anywhere.

Although defense counsel asked questions of the DNA expert as to how DNA can be transferred, no witness testified that Defendant tucked the victim in after having sex with his wife.

Considering the victim's trial testimony and the corroborating DNA evidence, the evidence was sufficient to prove penetration, however slight. Furthermore, the jury obviously chose to believe the victim's trial testimony regarding penetration and her explanation as to why she previously said that no penetration occurred. Thus, the evidence was sufficient to find Defendant guilty of aggravated rape.

This assignment lacks merit.

### LESS THAN UNANIMOUS VERDICT

In this assignment of error, Defendant alleges that the trial court erred in allowing Defendant to be convicted by less than a unanimous verdict. Defendant was convicted by a vote of ten to two. Citing *State v. Goodley*, 398 So.2d 1068 (La.1981), appellate counsel argues that since aggravated rape is punishable by death and there is no indication that the State would not seek the death penalty, a

14

unanimous jury verdict was required. For the reasons that follow, we find that *Goodley* is no longer controlling, and the trial court did not err in allowing a less than unanimous verdict.

First, we note that Defendant did not raise the non-unanimous jury verdict issue in the trial court. In fact, Defendant did not object when the trial court informed the jury that ten of them had to agree in order to reach a verdict. Although this court has held that the constitutionality of the non-unanimous jury verdict scheme in Louisiana must be preserved by contemporaneous objection, the error complained of in this case is different. *See State v. Duplantis*, 13-424 (La.App. 3 Cir. 11/27/13), 127 So.3d 143. Defendant in the present case is not challenging the constitutionality of a non-unanimous verdict. Rather, Defendant is arguing that he was charged with a capital crime for which a unanimous jury verdict was required. When faced with this issue in *Goodley*, 398 So.2d 1068, the supreme court addressed the issue as an error patent. Thus, we will address the error despite the fact that no objection was made in the trial court.

Aside from its determination that this issue is an error patent, we find that *Goodley* is not controlling in this case. As cited by appellate counsel, *Goodley* held that a unanimous verdict was required when a defendant is charged with a capital offense, even when the State stipulated that it would not seek the death penalty. In making this finding, the supreme court reasoned:

> The Legislature, in enacting the controlling provision herein, relied on the severity of the punishment provided for a crime as the basis for its classification scheme in providing the number of jurors which must compose a jury and the number of jurors which must concur to render a verdict. As stated above, La.Const. of 1974 Art. I, § 17 and C.Cr.P. art. 782 provide in pertinent part:

15

> "A criminal case in which the punishment may be capital shall be tried before a jury of twelve persons, all of whom must concur to render a verdict."

> Thus, the Legislature determined that for crimes that were so serious as to validly carry the death penalty, certain special procedural rules were additionally required, among which was the requirement of a unanimous jury to render a verdict. This determination is not based on an after the fact examination of what crime the defendant may eventually be convicted of, nor is it based on an after the fact examination of what sentence he receives. Rather, the scheme is based on a determination by the Legislature that certain crimes are so serious that they require more strict procedural safeguards than other less serious crimes. It was determined that in charged capital offenses a unanimous verdict for conviction, not just sentencing, is necessary and there is no attendant provision giving the state the authority to alter that scheme on its own motion by simply stipulating that the death penalty will not be sought in a certain case.

*Id.* at 1070-71.

Since *Goodley*, however, the legislature has enacted a "hybrid" capital/non-capital aggravated rape statute. Now, the aggravated rape statute allows for either a capital or non-capital aggravated rape charge:

> (D)(1) Whoever commits the crime of aggravated rape shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.

> (2) However, if the victim was under the age of thirteen years, as provided by Paragraph A(4) of this Section:

> (a) And if the district attorney seeks a capital verdict, the offender shall be punished by death or life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence, in accordance with the determination of the jury. The provisions of C.Cr.P. Art. 782 relative to cases in which punishment may be capital shall apply.

> (b) And if the district attorney does not seek a capital verdict, the offender shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. The provisions of C.Cr.P. Art. 782 relative to cases in which punishment is necessarily confinement at hard labor shall apply.

La.R.S. 14:42.

As stated by the first circuit in *State v. Mizell*, 05-2516, p. 7 (La.App. 1 Cir. 6/9/06), 938 So.2d 712, 716, this "hybrid" statute gives the State the "discretion of pursuing a violation of the aggravated rape statute . . . as a capital offense or as a non-capital life imprisonment offense."  "A unanimous verdict is still required when the state opts to prosecute under LSA-R.S. 14:42(D)(2)(a), the capital verdict portion of the 'hybrid' statute." *Id.*  By the same token, if the State does not opt to prosecute under the capital portion of the statute, a unanimous verdict is not required.

In brief, appellate counsel alleges that a unanimous verdict was required because there is no indication in the present record that the State would not seek the death penalty:

> There is no indication that the State would not seek the death penalty.  This was not noted on the Bill of Indictment nor was it mentioned when the Indictment was read to the jury.  The jury was merely instructed that any conviction for aggravated rape carried a life sentence.  However, there is nothing in the record indicating the State opted not to seek the death penalty.  A unanimous jury was required by statute as Alcide was being prosecuted for aggravated rape, a capital offense.

We agree with appellate counsel in that the State made no indication in the grand jury indictment as to whether or not it was charging Defendant with aggravated rape as a capital or non-capital offense.  However, there is nothing in the record to indicate that the State was charging Defendant with a capital offense. In fact, the record supports a finding that the State was pursuing a non-capital offense.  The trial court informed the jury, without any objection or comment by either the State or the defense, that the possible imprisonment was life. Additionally, the trial court charged the jury, again without any objection or comment by either party, that ten out of twelve of the jurors must agree to reach a

17

verdict. Then, after the jury found Defendant guilty, the trial court sentenced Defendant to life imprisonment without any objection by the State. Finally, as argued by the State in brief, the death penalty was not an option in this case in light of the Supreme Court's ruling in *Kennedy v. Louisiana*, 554 U.S. 407, 128 S.Ct. 2641 (2008), that the Eighth Amendment of the United States Constitution prohibits the death penalty for the rape of a child where the crime did not result, and was not intended to result, in the victim's death.

Because there is nothing in the record to suggest that the State pursued the death penalty against Defendant (in fact the record suggests otherwise) and because the death penalty was not an option, a unanimous jury verdict was not required in the present case. *See State v. Craig*, 09-1547 (La.App. 3 Cir. 6/2/10) (unpublished opinion), *writ denied*, 10-1533 (La. 1/14/11), 52 So.3d 900, where this court relied upon the absence of anything in the record to suggest the state was seeking the death penalty as grounds for upholding the appropriateness of the defendant's waiver of jury trial.

This assignment lacks merit.

## EVIDENCE OF OTHER CRIMES

In this assignment of error, Defendant contends that the trial court erred in allowing evidence of other crimes to be admitted at trial. Specifically, Defendant claims that the trial court erred in allowing B.D. to testify that Defendant raped her. We find that the trial court did not err in admitting B.D.'s testimony.

Prior to trial, the State filed a Notice of Intent to use Evidence of Other Crimes Evidence Pursuant to 412.2. In the notice, the State asserted that it intended to use prior bad acts committed by Defendant from "2006 through 2009 upon victim [B.D.]." At a hearing prior to trial, defense counsel noted his

18

objection to the other crimes evidence, arguing that since Defendant was never charged with the other crimes allegations, the introduction of such evidence would be more prejudicial than probative. During trial, the trial court held a hearing outside of the jury's presence to determine the admissibility of B.D.'s testimony. B.D., age sixteen at the time of trial, testified that Defendant started raping her when she was seven or eight and did not stop until she was twelve. Although B.D. testified that the rapes generally occurred in her room or her mom's room, Defendant did rape her when other kids were present in the room. B.D. also testified that Defendant put his penis inside her vagina and put his mouth on her vagina. Finally, B.D. testified that Defendant never played with her breasts.

Because the hearing was simply to determine the admissibility of B.D.'s testimony, the trial court did not allow cross-examination. The trial court found the evidence admissible under La.Code Evid. art. 412.2 as similar crimes, acts, or wrongs. Defense counsel noted his objection for the record without alleging any particular grounds. Prior to B.D.'s testimony at trial, at the request of defense counsel, the trial court instructed the jury that B.D.'s testimony, if believed by the jury, should only be considered for the purpose of showing Defendant's "guilty knowledge, absence of mistake or accident, intent, system, motive, identity, and/or Defendant's lustful disposition toward young girls or his propensity to sexually assault young girls . . . who are under his care, control, custody, and supervision."

On appeal, appellate counsel claims that the trial court erred in admitting B.D.'s testimony because her testimony was factually distinct and irrelevant to the victim's allegations against Defendant. Appellate counsel alleges that B.D.'s accusations are factually distinct from the victim's allegations because: 1) B.D. testified that Defendant raped her for several years while the present victim claims

Defendant raped her only once; 2) B.D. lived with Defendant whereas the present victim did not; 3) B.D. alleges there was penetration while the present victim told both the Stuller Place interviewer and the doctor that no penetration occurred; and 4) B.D. testified that Defendant did not touch her breasts while the present victim told the Stuller Place interviewer that Defendant did touch her breasts.

Appellate counsel also questions the veracity of B.D. because: 1) B.D. claimed one of the rapes occurred while other children were in the room; 2) B.D. testified that the rapes occurred when her mother left for work, yet her mother ran a daycare out of the home; 3) no other complaints of abuse were alleged by the children in the daycare or B.D.'s siblings; 4) although B.D. told her fourth-grade teacher that Defendant raped her, she changed her story and said it did not happen; and 5) no evidence was presented to corroborate B.D.'s allegations.

Finally, appellate counsel argues that the prejudicial effect of B.D.'s testimony outweighed its probative value. Appellate counsel asserts that Defendant was forced to "defend his life against two crimes when he was only charged with one and never arrested or convicted of the other."

The State argues that the similarities between the offense allegedly committed against B.D. and the offense committed against the present victim justified the admission of B.D.'s testimony. Furthermore, the State points out that the trial court gave the jury a limiting instruction immediately prior to B.D.'s testimony and again when instructing the jury on their charges.

We find that Defendant is limited on appeal to challenging the trial court's admissibility of B.D.'s testimony on the basis raised in the trial court – that the prejudicial effect of the evidence outweighed its probative value. Defendant did not argue in the trial court that the rape allegedly committed on B.D. was distinct

20

from the rape committed on the present victim, nor did Defendant argue that B.D.'s veracity was questionable. It is well-settled that a defendant may not raise an argument on appeal that was not asserted in a contemporaneous objection at trial. La.Code Crim.P. art. 841. "This rule applies to instances where a party objected to the introduction of evidence at trial on one ground but either adds to or changes the basis for challenging the evidence on appeal." *State v. Landry*, 08-318, p. 6 (La.App. 3 Cir. 10/1/08) (unpublished opinion) (citing *State v. Clayton*, 427 So.2d 827 (La.1982); *State v. Ford*, 349 So.2d 300 (La.1977)). Thus, Defendant is precluded from seeking review of the trial court's admissibility of the other crimes evidence on the basis that it was distinctive from the crime committed against the victim and on the basis that B.D. was not credible. Arguably, Defendant is also precluded from arguing on appeal that the prejudicial effect of B.D.'s testimony outweighed its probative value since Defendant did not raise this argument "contemporaneous" with the admission of the evidence. Although defense counsel raised this argument at a hearing prior to trial, defense counsel simply noted a general objection when the trial court actually ruled on the admissibility of the evidence at trial. Since the argument was raised in the trial court, however, we will address the argument.

Louisiana Code of Evidence Article 412.2 governs the admission of similar crimes, wrongs, or acts in sex offense cases. The article provides in pertinent part:

> A. When an accused is charged with a crime involving sexually assaultive behavior, or with acts that constitute a sex offense involving a victim who was under the age of seventeen at the time of the offense, evidence of the accused's commission of another crime, wrong, or act involving sexually assaultive behavior or acts which indicate a lustful disposition toward children may be admissible and may be considered for its bearing on any matter to which it is relevant subject to the balancing test provided in Article 403.

21

The supreme court has stated the following regarding the standard of reviewing the admissibility of evidence under La.Code Evid. art. 412.2:

> A trial court's ruling on the admissibility of evidence is reviewed for an abuse of discretion. *State v. Cosey*, 97-2020 (La. 11/28/00), 779 So.2d 675, 684. This same standard is applied to rulings on the admission of other crimes evidence and evidence under La. C.E. art. 412.2. *State v. Merritt*, 04-204 (La.App. 5 Cir. 6/29/04), 877 So.2d 1079, 1085, *writ denied*, 04-1849 (La. 11/24/04), 888 So.2d 228; *State v. Humphries*, 40,810 (La.App. 2 Cir. 4/12/06), 927 So.2d 650, 656, *writ denied*, 06-1472 (La. 12/15/06), 944 So.2d 1284.

*State v. Wright*, 11-141, pp. 10-11 (La. 12/6/11), 79 So.3d 309, 316. The supreme court further stated that "Article 412.2 was enacted to loosen restrictions on 'other crimes' evidence, and to allow evidence of 'lustful disposition' in cases involving sexual offenses." *Id.* at 317. In weighing the probative value versus the prejudicial effect of the other crimes evidence before it, the supreme court looked at the similarities between the other crimes evidence and the facts presently before it. *Id.* Finding the similarities between the two acts "were sufficiently probative to support the admission" of the other crimes evidence, the supreme court noted that the "evidence demonstrates defendant had a propensity for sexual activity with adolescents where he held a position of authority, and where the adolescent children were in his household." *Id.* at 317-18. Likewise, in the present case, B.D.'s testimony and the victim's testimony demonstrate that Defendant had a propensity for sexual activity with adolescents where he held a position of authority and where the adolescents were in his household. Both B.D. and the victim were young girls related to Defendant. The testimony was that both were raped while in Defendant's household in a room with other children sleeping.

In *Wright*, the supreme court found that the other crimes evidence was not so prejudicial as to warrant exclusion. The court cited the following explanation of the balance between the probative value of evidence and its prejudicial effect:

> Any inculpatory evidence is "prejudicial" to a defendant, especially when it is "probative" to a high degree. As used in the balancing test, "prejudicial" limits the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial. The term "unfair prejudice," as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged.

*Id.* at 318 (quoting *State v. Rose,* 06-402 (La. 2/22/07), 949 So.2d 1236, 1244).

Considering the limiting instruction given by the trial court in this case, along with the victim's testimony and the DNA evidence, the admission of B.D.'s testimony alone would not "lure" the jury into finding Defendant guilty of the charged rape of the victim. Thus, we find that the prejudicial effect of B.D.'s testimony did not outweigh its probative value.

Finally, even if B.D.'s testimony was erroneously admitted, any error would be harmless. As this court recently stated, "[I]t is well established jurisprudence in Louisiana that inadmissible other-crimes evidence is subject to a harmless error analysis." *State v. Barnes*, 13-576, p. 3 (La.App. 3 Cir. 12/11/13), 127 So.3d 1070, 1073. As a practical guide, Louisiana courts have adopted the harmless error test announced in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824 (1967):

> *Chapman* tests whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." 386 U.S. at 24; 87 S.Ct. at 828. An error did not "contribute" to the verdict when the erroneous trial feature is unimportant in relation to everything else the jury considered on the issue. *Yates v. Evatt*, 500 U.S. 391, 403, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432 (1991), *overruled as to standard of review for erroneous jury instructions in Estelle v. McGuire*, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).

> *Chapman* was refined in *Sullivan v. Louisiana*, 508 U.S. 275,
> 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). The *Sullivan* inquiry "is not
> whether, in a trial that occurred without the error, a guilty verdict
> would surely have been rendered, but whether the guilty verdict
> actually rendered is *this* trial was surely unattributable to the error."
> *Id.*, 508 U.S. at ____, 113 S.Ct. at 2081. This Court adopted the
> *Sullivan* refinement of *Chapman*. *See State v. Code*, 627 So.2d at
> 1384; *State v. Bourque*, 622 So.2d at 241 fn. 20.

*State v. Johnson*, 94-1379, pp. 13-14 (La. 11/27/95), 664 So.2d 94, 100.

Considering the victim's testimony and the DNA evidence submitted in the present case, the guilty verdict was surely unattributable to B.D.'s testimony, even if that testimony was erroneously admitted. Appellate counsel argues that the erroneous admission of B.D.'s testimony would not be considered harmless because the verdict was based solely on the victim's credibility, which was tarnished by her previous statements that no penetration occurred and the lack of physical evidence other than Defendant's DNA. As stated previously, the jury heard the victim's testimony as well as her explanation as to why she previously stated no penetration occurred. The jury chose to believe the victim, and their determination was rational. Moreover, the presence of Defendant's DNA found within the victim's vagina was presented to the jury without any explanation of how the DNA could have been deposited innocently. Finally, prior to B.D.'s testimony, defense counsel elicited testimony from the victim's mother regarding the alleged rape committed on B.D. Defense counsel asked Ms. Barnes if any other children said anything to her the morning she found out that the victim was raped. Mr. Barnes responded:

A:  [B.D.] ran up to - - [B.D.] ran up to me and told me that happened to her, too.

Q:  Okay.  That same night?

A: That same morning.

Q: That the same thing happened to her as had happened to - -

A: [T.J.]. But not in that night.

Thus, defense counsel elicited testimony regarding Defendant's alleged rape of B.D. before the State introduced B.D.'s testimony.

Considering the foregoing, the trial court did not err in allowing B.D.'s testimony. Accordingly, this assignment lacks merit.

## CONSTITUTIONALITY

In this assignment of error, Defendant challenges the constitutionality of Louisiana's scheme of allowing non-unanimous jury verdicts in cases where life imprisonment must be imposed. Defendant is precluded from raising this issue on appeal since the issue was not raised in the lower court. *See State v. Brooks,* 12-226 (La.App. 5 Cir. 10/30/12), 103 So.3d 608, *writ denied,* 12-2478 (La. 4/19/13), 111 So.3d 1030.

## PROSECUTORIAL MISCONDUCT AND INEFFECTIVE COUNSEL

Defendant also makes various allegations of prosecutorial misconduct. In none of the instances, however, did defense counsel object at trial. Thus, in accordance with La.Code Crim.P. art. 841, Defendant is precluded from raising the alleged errors on appeal unless he can show his counsel was ineffective for failing to object. Defendant alleges that his counsel was ineffective for failing to object to the alleged prosecutorial misconduct. Thus, we will address Defendant's ineffective-assistance-of-counsel claim.

A criminal defendant is guaranteed the effective assistance of counsel. United States Sixth Amendment; La. Const. art. I, § 13; *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Washington*, 491 So.2d 1337 (La.1986). To establish a claim of ineffective assistance, a defendant must show that

25

counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and, that counsel's professional errors resulted in prejudice to the extent that it undermined the functioning of the adversarial process and rendered the verdict suspect. *Strickland v. Washington, supra; Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). This does not mean "errorless counsel [or] counsel judged ineffective by hindsight, but counsel reasonably likely to render effective assistance." *State v. Ratcliff*, 416 So.2d 528, 531 (La.1982).

A claim of ineffectiveness is generally relegated to post-conviction, unless the record permits definitive resolution on appeal. *E.g., State v. Prudholm*, 446 So.2d 729 (La.1984). However, when the record is sufficient for review, this Court will reach the merits of complaints about counsel's performance and grant relief when appropriate. *E.g., State v. Hamilton*, 92-2639 (La.7/1/97), 699 So.2d 29, 32-35.

*State v. Bright*, 98-398, pp. 40-41 (La. 4/11/00), 776 So.2d 1134, 1157, *reversed on other grounds*, 02-2793 (La. 5/25/04), 875 So.2d 37.

In this case, Defendant claims his counsel was ineffective for failing to object to various statements he claims constituted prosecutorial misconduct. Defendant claims the prosecutor committed misconduct when he: 1) referred to Defendant as a child predator in his opening statement; 2) allowed Dr. Burnell to vouch for the victim's credibility by stating that she had a believable story; 3) asked the DNA expert if it was possible there were aliens after defense counsel asked the expert if someone else could have possibly been the minor contributor of DNA found on the victim's vaginal swab; 4) told the DNA expert to send her bill to the District Attorney; 5) told the jury in closing argument that Defendant "thought" the victim was too weak to tell anyone what he did to her; 6) referred to Defendant as a predator in closing argument; 7) described the victim's medical examination as an "excruciating event of being violated;" 8) argued that the unknown DNA was the victim's DNA; and 9) argued that there was no way the victim could have "bumped" into Defendant's sperm.

26

Had defense counsel objected to each of the statements above, the only remedy available to defense counsel would have been to ask for an admonition or mistrial under La.Code Crim.P. art. 771. That article provides:

> In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
>
> > (1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or
> >
> > (2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
>
> In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.

In *State v. Draughn*, 05-1825, pp. 44-45 (La. 1/17/07), 950 So.2d 583, 614, *cert. denied*, 552 U.S. 1012, 128 S.Ct. 537 (2007), the supreme court stated:

> Mistrial is a drastic remedy, and the determination of whether prejudice to the defendant has resulted from the prosecutor's comments lies in the sound discretion of the trial judge. *State v. Leonard*, 2005-1382 p. 11 (La. 6/16/06), 932 So.2d 660, 667. Moreover, a trial judge has broad discretion in controlling the scope of closing argument. *State v. Prestridge*, 399 So.2d 564, 580 (La.1981). Although prosecutors are allowed wide latitude in choosing closing argument tactics, they should not misstate the evidence. However, even if the prosecutor exceeds the bounds of closing argument, this court will not reverse a conviction unless thoroughly convinced that the argument influenced the jury and contributed to the verdict. *State v. Martin*, 1993-285 p. 18 (La. 10/17/94), 645 So.2d 190, 200, cert. denied, 515 U.S. 1105, 115 S.Ct. 2252, 132 L.Ed.2d 260 (1995).

Defendant has failed to show that even if his trial counsel would have objected to the above comments, an admonition was warranted, much less that a mistrial would have been warranted under La.Code Crim.P. art. 771. Furthermore,

considering the victim's testimony, B.D.'s testimony, and the corroborating DNA evidence, the comments made by the prosecutor, even if improper, were not sufficiently prejudicial to thoroughly convince this court that the comments influenced the jury and contributed to the verdict. Thus, Defendant fails to prove that he was prejudiced by his counsel's failure to object to the above comments.

Regarding his claim that the prosecutor allowed Dr. Burnell to "vouch" for the victim's credibility by stating that she presented a "believable" story, Defendant cites *Rhue v. State*, 693 So.2d 567 (Fla.App. 2 Dist. 1996). In *Rhue*, the Florida court found that the defendant's counsel was ineffective for failing to object to the testimony of several witnesses (a doctor, the victim's mother, the victim's grandmother, and the victim's great grandmother) regarding the victim's credibility. Louisiana courts have also found that an expert witness must not give an "opinion directly concerning the particular victim's credibility." *State v. V.L.G.*, 11-634, p. 12 (La.App. 3 Cir. 12/7/11) (unpublished opinion) (quoting *State v. Myles*, 04-434, p. 11 (La.App. 5 Cir. 10/12/04), 887 So.2d 118, 125). Because the victim's credibility in *Rhue* was the determinative issue at trial, the court found that defense counsel should have objected to the testimony and comments vouching for the victim's credibility. Unlike the present case, however, the court in *Rhue* noted that the only evidence that corroborated the victim's statement was his grandmother's testimony that his back was bruised and his penis was red, swollen, and badly bruised the day after the incident. To the contrary, in the present case there was DNA evidence corroborating the victim's testimony. Thus, Dr. Burnell's testimony as to the victim's "believability" in the present case would not have been as likely to influence the jury's verdict.

Furthermore, it is not as clear in the present case that defense counsel's failure to object was not a considered strategic decision. Dr. Burnell testified that the victim told him Defendant did not penetrate her. Thus, defense counsel may have thought it was better for the jury to believe Dr. Burnell's testimony that the victim's story to him was "believable." Both defense counsel and appellate counsel have used the victim's "non-penetration" statement to Dr. Burnell as support for Defendant's argument that no rape occurred because no penetration took place.

We find no merit to Defendant's claims of ineffective assistance of counsel.

## DECREE

Defendant's conviction and sentence is affirmed.

**AFFIRMED.**