NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

**23-123**

STATE OF LOUISIANA

VERSUS

CHRISTOPHER GATSON

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 348,420
HONORABLE WILLIAM GREGORY BEARD, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**ELIZABETH A. PICKETT**
**CHIEF JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, Ledricka J. Thierry, and Wilbur L. Stiles, Judges.

**AFFIRMED.**

**G. Paul Marx**
**Louisiana Appellate Project**
**PO Box 82389**
**Lafayette, LA 70598-2389**
**(337) 237-2537**
**COUNSEL FOR DEFENDANT- APPELLANT:**
    Christopher Gatson

**Phillip Terrell, Jr.**
**District Attorney, Ninth Judicial District**
**Kenneth A. Doggett, Jr.**
**Assistant District Attorney**
**P. O. Box 7358**
**Alexandria, La 71306-7358**
**(318) 473-6650**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**PICKETT, Chief Judge.**

## FACTS

The defendant, Christopher Gatson, is accused of having sexual intercourse with the victim on several occasions between January of 2019 and October of 2019. The victim turned thirteen in August of 2019. According to the victim, who referred to the defendant as her "god-daddy," one of the incidents of sexual intercourse occurred before her thirteenth birthday.

On September 29, 2020, the defendant was charged by grand jury indictment with one count of first degree rape, a violation of La.R.S. 14:42, and one count of carnal knowledge of a juvenile, a violation of La.R.S. 14:80. On September 23, 2022, after a four-day jury trial, the defendant was found guilty of both counts. Thereafter, on November 14, 2022, a motion for post-verdict judgment of acquittal was denied by the trial court. After the defendant waived the sentencing delay required by La.Code Crim.P. art. 873, the trial court gave its reasons for sentencing and sentenced the defendant to life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence for first degree rape and ten years at hard labor for carnal knowledge of a juvenile. The trial court ordered the sentences to run consecutively. The trial court also designated the first degree rape conviction as a crime of violence and provided written notification of the defendant's sex-offender registration requirements.

Pursuant to the defendant's motion for appeal, on December 7, 2022, the trial court granted an appeal of the defendant's conviction and sentence. Thereafter, on December 12, 2022, the defendant filed a Motion for Reconsideration of Sentence, which was denied by the trial court that same date. On appeal, the defendant alleges three assignments of error.

## ASSIGNMENTS OF ERROR

1. The evidence was insufficient to prove the age of the victim at the time of the offense: THE STATE DID NOT PROVE BEYOND A REASONABLE DOUBT THAT INTERCOURSE OCCURRED BEFORE THE THIRTEENTH BIRTHDAY OF J.B. ABSENT THAT PROOF, THE HIGHEST GRADE OFFENSE IN THIS CASE IS CARNAL KNOWLEDGE.

2. It was error to restrict cross examination of the credibility of the victim under the Rape Shield Statute: THE TRIAL COURT ERRED IN RULING THAT THE ALLEGED VICTIM COULD NOT BE CROSS EXAMINED ON PRIOR STATEMENTS TO IMPEACH HER CREDIBILITY UNDER THE "RAPE SHIELD" PROVISIONS OF CODE OF EVIDENCE ARTICLE 412.

3. Due process was denied to Christopher Gatson when the court refused to order discovery before indictment. THE TRIAL COURT ERRED IN DENYING DISCOVERY BASED ON "NO BILL OF INFORMATION FILED", WHERE CHRISTOPHER GATSON WAS INCARCERATED AND UNABLE TO POST BOND. DEFENDANT['S] RIGHTS TO CONFRONTATION AND DUE PROCESS WERE APPLICABLE IMMEDIATELY BECAUSE OF LOSS OF LIBERTY.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find no errors patent.

## ASSIGNMENT OF ERROR NUMBER ONE

The defendant contends the State failed to prove beyond a reasonable doubt that intercourse occurred between the defendant and the victim (J.B.) prior to the victim's thirteenth birthday.[1] Absent such proof, the defendant argues the evidence was sufficient to prove carnal knowledge of a juvenile, not first degree rape. For the reasons discussed, this assignment lacks merit.

---

[1]Initials of the victim are used pursuant to La.R.S. 46:1844(W)(1)(a).

2

*Standard of Review*

In reviewing the sufficiency of evidence, this court has set forth the standard of review as follows:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La. 1981). It is the role of the fact finder to weigh the respective credibilities of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See Graffagnino*, 436 So.2d at 563, *citing State v. Richardson*, 425 So.2d 1228 (La.1983). To obtain a conviction, the elements of the crime must be proven beyond a reasonable doubt.

*State v. Thacker*, 13-516, p. 5 (La.App. 3 Cir. 1/28/15), 157 So.3d 798, 804 (quoting *State v. Freeman*, 01-997, pp. 2-3 (La.App. 3 Cir. 12/12/01), 801 So.2d 578, 580).

*Evidence Presented at Trial*

The first piece of evidence introduced at trial was S-1, the victim's Children's Advocacy Center (CAC) interview. A transcript of the interview was introduced into the record as S-2 and was made available for the jury to read while the interview was played. The trial court agreed that it would instruct the jurors that if there was any discrepancy between the transcript and the video, the video would prevail.

The state introduced as S-3 a complete copy of the victim's medical records. A "slimmed down" version of the medical records was also introduced as S-4 and included only those records related to the matter at issue.

The first witness to testify was Heather Ducote, a school-based nurse practitioner for Rapides Parish. Ms. Ducote worked at Alexandria Middle Magnet

and performed wellness checkups on the students that had Medicaid. According to Ms. Ducote, these types of checkups were called "KIDMED" visits. During Ms. Ducote's wellness visit with the victim, the following occurred:

> A. I seen [sic] her for the first time. She just came in for a wellness visit. And with all my kids I ask them, you know, do they feel safe at home, and normal things like they [sic] brush their teeth, just the random questions we ask. And I also ask if they're sexually active, and most the [sic] children say no. She did tell me no that day, and she did, was not sexually active. So I didn't think nothing else of it. I usually go by what they say, but the test results came back two days later that she was positive for chlamydia. That's a red flag, especially with her age. So what we do is we, we treat.

According to Ms. Ducote, chlamydia is one of the most common sexually transmitted diseases (STDs).

Ms. Ducote identified S-3 as a complete set of the victim's medical records. According to the records, Ms. Ducote testified, the victim's date of birth was August 25, 2006. During Ms. Ducote's testimony, the state published S-4 to the jury. When asked if S-4 contained the date of treatment described by Ms. Ducote, Ms. Ducote indicated that it was October 25, 2019. Ms. Ducote testified that this was the date of the victim's initial KIDMED wellness visit. Ms. Ducote also pointed to the portion of the records that indicated the victim denied sexual activity during that initial visit.

When Ms. Ducote was directed to the portion of the record indicating that the victim's urine test showed chlamydia, Ms. Ducote testified:

> A. It did. I always do a follow up as soon as I get my lab results so we can treat as soon as possible. When she came back in we did question her. And she, she had denied it first that she was sexually active, but she finally opened up and said that she did have sexual relations with someone.

Reading from the report, the prosecutor stated:

> Q. . . . . Okay, so I'm just saying it aloud, patient states it was consensual and one time occurrence with her boyfriend about two months ago. Is that fair?

4

A.    Yes, sir.

Q.    And she states she does have some greenish white discharge at this time and denies burning with urination. Is that –

A.    Yes, sir.

According to Ms. Ducote, she asked the victim if she wanted to notify her parent while she was in the office or if she wanted Ms. Ducote to notify her parent. Ms. Ducote testified that the victim chose to be the one to notify and further testified that the victim called either her mother or stepmom. When asked to describe the victim's demeanor during the call, Ms. Ducote replied, "She was cheerful. I've had a handful of . . . young children, who have tested positive. And they're always very tearful and shocked." The victim's guardian, who Ms. Ducote believed was the victim's mother, arrived at Ms. Ducote's office. Besides making a report to the state, Ms. Ducote's involvement ended.

On cross-examination, Ms. Ducote agreed that on October 29, 2019, the victim said that she had been sexually active one time with her boyfriend. The following colloquy ensued:

Q.    Your notes also shows [sic] that the sexual occurrence happened approximately two months prior to ten twenty-nine, twenty nineteen, based on what she's told you, correct?

A.    Correct.

Q.    Would you agree that this would have been approximately sometime around August of twenty nineteen, two months prior?

A.    That's two months before October, so, yes.

          . . . .

Q.    Okay. So based on your examination and your conversation with [J.B.], -

A.    Um-hmmm (affirmative).

Q. - you under, after the, you, you ended the conversation with her you understood that she had had only one sexual partner, and it was what she called her, with her boyfriend around August twenty nineteen, correct?

A. That is what she told me.

The next witness to testify was Shannon Constantine, a Louisiana State Trooper who formerly worked with the Alexandria Police Department. Trooper Constantine recalled a meeting with the victim and her mother in October 2019. The complaint, Trooper Constantine testified, involved improper sexual contact with the victim. The trooper overheard the victim tell her mother that the victim's "godfather, Mr. Gatson, had picked her up, and they had sexual intercourse approximately five times." When asked what the victim told her, Trooper Constantine replied:

A. She told, she told me that Mr. Gatson picked her up, and they had intercourse in his vehicle. And she told me also that on one occasion he gave her an iPhone, and on another occasion he gave her money in the amount of approximately thirty dollars. He also – she also told me that it was after dark in his vehicle.

Q. Okay. And so according to the best of your memory right now, that's everything the child told you, is that correct?

A. She also told me that it happened within the last, the, the, the first occurrence that she recalled was during the summer of that year.

Detective Patrick Harrison of the Alexandria Police Department testified that he investigated the allegations in question. Detective Harrison identified the defendant as the person accused of the crime he investigated. According to the detective, the initial report of the allegations was taken on October 29, 2019, and the case was assigned to him the following morning. The detective scheduled a CAC interview of the victim for November 6 and monitored the interview on that date. When asked if during the interview he heard allegations of an aggravated rape and carnal knowledge of a juvenile, Detective Harrison replied, "Yes, I did."

6

When asked what his thoughts were about the interview, Detective Harrison answered:

> A.     Just the description provided in the interview as well as by State law, the way the State law's written, a lot of it depends on aggravated, or, I'm sorry, first degree rape. They changed the term. First degree rape is dependent upon a birth, or birthday of the victim. So, for example, if, if the victim is under the age of thirteen, if they're from zero years old to twelve years old, and if they have sexual intercourse during that time, it would be a first degree rape. If they're over the age of thirteen, then it would be essentially a felony carnal knowledge of a juvenile.
>
> Q.     And in this case the victim's birthday played a large part in the investigation, is that fair?
>
> A.     It did, because as I said before, we, we received a complaint in October or late October. She stated that the, the, or the investigation showed me that the, some of the incidents occurred several weeks prior. And then, but we also were able to establish that at least one incident occurred prior to her birthday during the summer, which would have been, she was thirteen years old at the time. Prior to her birthday she would have been twelve years old, which would fall within the statute of the first degree –
>
> Q.     Okay. You said it pretty clear, but those are all just crucial points in the case, so I want to make sure I understand. One of the events happened before her birth date, as was established by her statement. The other four events happened after her birthday which would make her thirteen. Is that your understanding?
>
> A.     Yes, correct.

Detective Harrison testified that he understood the victim's birth date to be August 25, 2006. Although the detective did not know the defendant's date of birth, he believed the defendant was thirty-two at the time of the allegation. Upon refreshing his memory by looking at his report, Detective Harrison testified the defendant's date of birth was February 20, 1985. Based on the victim's CAC interview and the victim's positive test result for chlamydia, Detective Harrison requested an arrest warrant be issued for the defendant.

On cross-examination, Detective Harrison testified to the following regarding his determination that the victim was under the age of thirteen:

A.    Well, she was thirteen at the time she alleged the offense. Her date of birth is in August, towards the end of August. And she alleged that the offense occurred in the summertime, which normally summertime is June, July, kind of May and kind of getting into August. And I believe we actually asked her did any of the offenses occur prior to or after your birthday. And she said, well, at least one occurred prior to her birthday, when she would have been twelve years old.

Detective Harrison agreed that this determination was based on the victim's testimony alone. When defense counsel asked him if the allegations alone were sufficient for him, Detective Harrison answered that he tried to corroborate as much information as he could. According to the detective, the victim's mother corroborated the allegations when she said that the defendant would pick the victim up and take her away. Additionally, Detective Harrison testified the victim's positive chlamydia test was another corroboration. On re-direct, Detective Harrison testified that based on the evidence he heard, there were five instances of sexual contact.

The next witness, Kristin Bobbitt, conducted the CAC interview of the victim. The state published the CAC interview (S-1) while the jurors were able to read the transcript of the interview (S-2). The interview was conducted on November 9, 2019, at which time the victim was thirteen. When asked if she had been there before, the victim nodded her head and stated that she remembered the room. After talking with the victim about various things, Ms. Bobbitt asked the victim if she knew how she got chlamydia. The victim nodded her head and explained:

Okay, one day I was at mama['s] house. Me and my sister and my brother, but my sister's old enough to watch us at home and uh my sister was in the room. My brother was in mama['s] room and my supposed to be God-daddy came over there. And he asked me did I wanna ride with him to go get something to eat and I was like oh yeah, 'cause I mean I was hungry. I wanted something to eat, but I didn't feel like cookin' and then he was like okay, come ride with me. So I rode with him and then got to the point to where he just said take

8

off your clothes. And I was like (shakes head), why? And he was like oh just do it and I did it.

> . . . .

And we uh he said climb in the backseat so I got in the backseat. Didn't know what was goin' on but I was like okay so then I started doin' the nasty and you know it's like well wait, what are you doin'? Then afterwards he took me home and went and got something to eat, I was like that didn't feel right at all.

When Ms. Bobbitt asked the victim if this happened one time or more than one time, the victim stated that it happened "like five times." The victim said her "God-daddy's" name was Christopher Gatson. The victim explained that she called Mr. Gatson her "God-daddy" because he had been in her life since she was two years old, and her mother trusted him to take the victim places. Ms. Bobbitt and the victim agreed that Ms. Bobbitt would refer to the victim's "God-daddy" as "Christopher."

Ms. Bobbitt asked the victim to tell her about "the very first time something . . . happened with him that [the victim] didn't want to happen." The victim responded, "Okay, let me see. The part that I just told you." When Ms. Bobbitt asked if that was the very first time, the victim nodded her head. The following colloquy ensued:

> Kirstin: Okay, so tell me um is this the first time that he's ever done something like this or is that something that you normally go do with him?
>
> [J.B.]: No, it was like the first time.
>
> Kirstin: Okay, so um do you remember how old you were when this happened or how long ago this was?
>
> [J.B.]: It wasn't even long ago, 'cause it was long.
>
> Kirstin: So would it have been this year, like in 2019 or would it have been last year?
>
> [J.B.]: 2019.

Kirstin:    Okay, and um you're in eighth grade right now?

[J.B.]:    Mm-hmm, (nods head).

Kirstin:    So would it have been before this summer when you were in the seventh grade or during the summer or when you were in the eighth grade.  Help me understand when it would have been.

[J.B.]:    During the summer.

Kirstin:    During the summertime?  Okay, do you remember anything else about when it would have been, if it was near a birthday or holiday or anything like that?  If not, it's okay.

[J.B.]:    I don't know or remember.

The victim could not remember where the defendant pulled over but remembered that it was somewhere close to a restaurant called Khan's in Alexandria.  According to the victim, she could see dumpsters with trash falling out of them.  The victim told Ms. Bobbitt that she and the defendant took their clothes off, and the defendant got on top of her.  When Ms. Bobbitt asked what body parts are involved in "doin' the nasty," the victim said the "privacy part."  The victim explained that she used her "privacy part" for "peein' or something" while the defendant used his "privacy part" for "[p]eein' and everything else."  When asked if during the incident by the dumpsters, the defendant's "privacy part" touched her "privacy part," the victim nodded her head.  The victim stated that the defendant's "privacy part" touched the "inside[.]"  When asked what made this stop, the victim replied, "I was like get off of me, I was like I'm ready to go home."  The victim stated that they put their clothes back on and were quiet on the way back home.

When asked how long it was before something happened again, the victim answered, "Maybe I could say two or three weeks."  In between the two or three weeks, the victim talked with the defendant on the phone but did not talk about

what happened between them. When Ms. Bobbitt asked the victim to tell her about

the next time it happened, the following colloquy took place:

> [J.B.]: It was the same old stuff, but I was like you just don't feel right to me. That's what I was tellin' him like, (shakes head), mm-mm. I was like you ain't my size. No, (shakes head), I don't like it.
>
> Kirstin: Okay, so um I know the first time you told me it started because he came and he told you to come get something to eat with him and y'all left.
>
> [J.B.]: (Nods head), mm-hmm.
>
> Kirstin: Tell me about how this time started, the second time.
>
> [J.B.]: So like he be like oh come ride with me to my house. It's so like every time he make up an excuse, come ride with me this place, come ride with me go pick up somebody and I really think we be going to pick up somebody and go to his mama['s] house 'cause I like his mama. He be like come ride, come ride with me to my mama['s] house. Let's go pick up (inaudible), let's go do this, let's go do this.
>
> Kirstin: Okay, so the other times that it happened, were they all the same as the first time you told me about it or was any or was there a time where something different happened?
>
> [J.B.]: They all was the same (shakes head).
>
> Kirstin: It was always the same.
>
> [J.B.]: (Nods head).
>
> Kirstin: Tell me what was the same about it.
>
> [J.B.]: Like gettin' in the backseat and stuff.
>
> Kirstin: Okay, um so the second time that happened, tell me what made that time stop.
>
> [J.B.]: Uh he had, he had just stopped when (inaudible).
>
> Kirstin: Okay, so of all the times that it happened, did you ever see anything come out of his privacy part?
>
> [J.B.]: Something white.
>
> Kirstin: Okay, and tell me about where the white stuff went.

11

[J.B.]:     Uh he had like shirts and stuff in the back of his truck. He'd got the shirts and wiped.

When asked if this happened anywhere else besides near Khan's and the dumpsters, the victim said it also happened by a school in Alexandria. According to the victim, the most recent time this happened was "three weeks ago" and occurred close to the defendant's mom's house. When asked what kept her from telling someone what was happening, the victim replied, "Like I was like I don't wanna get in trouble or I don't want everybody to think that I wanted to do it."

As for the timing of the first incident, the following colloquy took place:

Kirstin:    Okay, well Mr. Patrick did have a couple of things that he wanted um to understand a little better. So the first one was you know how we were talkin' about when the first time happened. You told me it was in the summer.

[J.B.]:     (Nods head).

Kirstin:    Okay, so I understand your birthday is in August?

[J.B.]:     Mm-hmm.

Kirstin:    Tell me about when your birthday is.

[J.B.]:     August 25, 2006.

Kirstin:    August 25, 2006, okay.

[J.B.]:     (Nods head).

Kirstin:    Um so tell me the first time that something happened with him, would it have been before your birthday or after your birthday?

[J.B.]:     Um before.

Kirstin:    Before your birthday, okay, and um do you remember how many times it happened before your birthday?

[J.B.]:     Once.

Kirstin:    Just once?

[J.B.]:     (Nods head).

After the video was played for the jury, Ms. Bobbitt testified that her involvement in the case was completed with the ending of the CAC interview.

The victim, J.B., was the next witness to testify. At the time of her testimony, the victim was sixteen years old. When asked if she had watched her entire video before her trial testimony, the victim replied, "Yes, sir[,]" and answered affirmatively when asked if it was all true and correct. The following colloquy then took place:

Q. Okay. So the questions I have for you are about what was said on the video. Are you ready?

A. Yes, sir.

Q. When you described what happened in the video you were talking about things that happened before and after your birthday. You remember –

A. Yes, sir.

Q. - that? When your, would you just tell everybody what your birthday is, please, ma'am?

A. My birthday is August twenty-fifth, two thousand and six.

Q. Okay. When you are talking about events before and after your birthday, is your birthday something that you celebrate while you're in school or is that something that happens before you go back to school?

A. I celebrate it in school.

Q. All right. And so when you and I were talking about it you said that the first event happened during the summer, is that right?

A. Yes, sir.

Q. And that was before school, is that right?

A. Yes, sir.

Q. Okay. And of that the jury is going to want to know whether you're sure about that. Are you –

A. Yes, sir.

Q.    - all the way up?

A.    Yes, sir.

Q.    Okay.  So after that how many more times did it happen?

A.    Four.

Q.    Okay.  And do you know about how often those times would happen?

A.    Yes, sir.

Q.    About how often would that happen?

A.    Like maybe two or three weeks.

Q.    Okay.  So –

A.    And give me –

Q.    - about two or three week intervals and you would see him and stuff would happen?

A.    Yes, sir.

When the state asked the victim to tell the jury exactly what happened to her, the victim responded, "He had sex with me."  The victim further stated, "He told me to pull my clothes off.  And after I pulled my clothes off he put his penis in my vagina."  The victim agreed that this happened on five different occasions.  When asked if one of the times occurred while she was twelve, the victim answered, "Yes, sir."

As for their relationship before the sexual incidents happened, the victim stated that she would see the defendant every weekend that he was off.  The defendant bought her school clothes, food, and would take her to get her nails done.  During the time the sex was occurring, the victim testified, the defendant bought her food and sometimes gave her money, "like sixty dollars."  According to the victim, the defendant never told her not to tell anyone.  The following colloquy ensued:

14

Q. After the first time, and certainly after the second time when he would come get you, did you know what he was coming to get you for?

A. Well, yeah, of course, but normally like he would always say we was going to this place, that place, so I used to really think we was going to go to that place. I wasn't nothing but twelve.

Q. When this happened to you how did it make you feel?

A. I felt all, all, like I felt bad for myself, because I could have protected myself. I could have said something, but I didn't.

When asked why she didn't say something about what was happening, the victim stated that she thought she would get in trouble, and she felt ashamed.

The state then asked the victim about the KIDMED appointment in which she was asked if she was having sex with anyone. When asked how she answered that question, the victim said she told Ms. Ducote that she was having sex with her boyfriend and explained to the prosecutor that she was "only trying to cover up from [her] mistakes." The following colloquy took place:

Q. Okay. So you went and saw her twice, right?

A. Yes, sir.

Q. And the first time is when they took a urine sample from you, right?

A. Yes, sir.

Q. And the second time's when they had results, right?

A. Yes, sir.

Q. I'm asking about that first time, before anybody knew –

A. Oh, the first time I didn't say nothing. I didn't –

Q. Okay.

A. - tell her nothing.

Q. Okay. So if she had asked you if you had had sex how would you have responded back?

15

A. With the same reply I replied the second time.

Q. Okay. I, another, okay. In the, in the records, and I can show you the records if you want to see them, it says that Ms. Ducote asked you that question, and you said no, I've not had sex with anybody. Would that be something that you said?

A. Yes, sir.

Q. Okay. That's what I'm asking. And I'm sorry it's difficult, but I don't want to give you the answer but I, I need to get to the fine point, okay? On the second time, the one that you're trying to tell me about, where you said I said my boyfriend did it but I'm just trying to cover up.

A. Yes, sir.

Q. The question in here is what did you mean by the word boyfriend?

A. Well, I was dating a boy in the eighth grade.

Q. Okay. Had you been having sex with him?

A. No, sir. We didn't see each other outside of school.

Q. At the time that Mr. Gatson was having sex with you, was he the only person you'd ever had sex with?

A. Yes, sir.

According to the victim, her mom took her to the hospital when she found out that the victim had chlamydia. The victim testified that a rape kit was performed, which she described as a "Q-Tip" being put inside of her to see if she had been touched. After the prosecutor stated that he did not know a rape kit had been performed on the victim, he asked the victim how long before the rape kit was performed had she had sex with Defendant. The victim responded, "Three weeks."

The victim identified the defendant as the person who did the "stuff" they had been talking about. According to the victim, the first place the things happened was Khan's "[b]y . . . the dumpsters and trash." The second place, the

16

victim explained, was "by the school where it had red and yellow things up and stuff." When asked if she had a clear memory of the other times, the victim responded:

A.      Yes.  It was at, one time pulled into a, like a house.  Pulled in the driveway.

Q.      Okay.  And one of the other things you said in the video was on, on a place near his mom's house.  Did it happen there as well?

A.      Yes, sir.

Q.      Okay.  So, so far, I think we're talking about four different places.  Does that sound right to you?

A.      Yes, sir.

Q.      Do you remember that fifth place?

A.      One of them was the same place.

Q.      Okay.  So you did it in one, you did it two times on one place?

A.      Yes, sir.

Q.      Which place was it that you did it two times then?

A.      In front of his mom's house.

The victim testified that she was telling the truth and that she had never told anyone that she wanted to drop the charges because she had made them up.

When asked on cross-examination if she remembered the day or month of the first incident, the victim replied, "July."  Defense counsel showed the victim S-4 and had her read a portion of it:

A.      This is a thirteen year old female who, who presents to the clinic with a chief complaint of follow-up lab work from KIDMED on ten twenty-five, nineteen.  The patient had denied being sexually active.  GCT positive for chlamydia.  The patient states it was consensual and a one time occurrence with her boyfriend about two months ago.  She states she does have some greenish white discharge at this time.  Denies burning with urination.

Q.   Okay.  I don't want to go into too much detail on that, but you told me at, you just stated that it happened, you thought, in July, correct?

A.   Uh-hmmm (affirmative).

Q.   And on the, the medical records here it looks like you stated that it happened in August.  Is that correct?

The state objected to defense counsel's use of "August" when the portion read by the victim did not say "August."  When the trial court asked defense counsel to rephrase the question, defense counsel asked the victim the date of her visit to the clinic.  When the victim stated, "September twenty-fifth[,]" defense counsel asked her to look at the date in the top lefthand corner of the report from which she read:

A.   Okay.  That's September the, hold on, August.  October the twenty-ninth, -

Q.   So it's October –

A.   - two thousand nineteen.

Q.   - twenty-ninth when you went in.  Is that correct?

A.   Yes, sir.

Q.   Okay.  And one more time here.  It states that patient states it was consensual and a one time occurrence with her boyfriend about two months ago.  My question to you would be if you went in on October the twenty-ninth, it happened about two months before that, right, based on your record here?

A.   That was trying to cover up.

Q.   So you were wanting to cover up the date also?

A.   Yes, sir.

Q.   Is there a reason why you would want to cover the date?

A.   Because I, I didn't want, I mean, I didn't want nothing to come up.  I didn't want to get in trouble.

Q.   Okay.

18

A.    Or nothing.

Q.    But in, and I, I guess, I want to make sure that I'm asking this correctly to you.  I noticed, know that you would want to potentially cover up that act, but after certain things were found out you're then saying that you still wanted to cover up not only the date, I mean not only the, the actual act, but also the date it happened.  Is that, is that what you're saying?

A.    Yes, sir.

The victim reiterated that the first time the defendant stopped his vehicle they were near dumpsters by Khan's.  The victim stated there were no other people in the parking lot but could not remember what day of the week it was.  Although she did not remember what time the defendant picked her up from her house, she estimated that it had been dark about two or three hours.  The victim also testified that this occurred sometime between July and August.  According to the victim, the defendant gave her sixty dollars after this occurrence.  When defense counsel pointed out that in the video, the victim said the defendant gave her thirty dollars, the victim testified, "I was trying to lower the money."  The following colloquy ensued:

Q.    Okay.  So you're saying that you not only told her that there was a, there was different dates, there was a different date, instead of it being in potentially August that it, but, I'm sorry, let me say it this way.  You stated that in, initially that, I'm sorry, this, just a few minutes ago you stated that it, it happened in July, correct?

A.    Um-hmmm (affirmative).  Yes, sir.

Q.    And, and also then the, the medical report you stated that it happened in, somewhere around August, correct?

A.    Yes, sir.

Q.    And you stated that you told them at the, the Winn Community Health Center that, that, because you were trying to protect Mr. Gatson, right?

A.    Yes, sir.

19

> Q. Now you're telling me also that initially it was stated that it was thirty dollars, but you're saying it's sixty now. And the reason for the change is because you were trying to lower the amount of money that he gave, is, is that what you're staying?
>
> A. Yes, sir.
>
> Q. Okay. Is there a reason why you wanted to tell a lower amount versus the actual amount?
>
> A. Yes, sir.
>
> Q. What, what was that reason?
>
> A. Because I didn't want to say he gave me more. I didn't want to say like a high amount.

The victim stated that she was sure it was sixty dollars because she posted the sixty dollars on Instagram. The victim explained that she was young and wanted people to know that she received some money. The victim further stated, "And I was only twelve years old."

About two or three weeks later, the victim testified, the second incident occurred in front of the house of the defendant's mom. The victim agreed with defense counsel that the second incident occurred at a house located across the street from the defendant's mom's house. Defense counsel pointed out that in the video, the victim said the incident occurred about four houses down from the defendant's mom's house. When defense counsel asked, "So it wasn't four houses down, it was right across the street[,]" the victim replied, "Yes, sir." According to the victim, for all the incidents, she was picked up from her mom's house, not her dad's. The victim remembered that when the first incident occurred, her mom was at the casino, but she did not remember where her mom was when the other incidents occurred.

Defense counsel questioned the victim about a statement she made in the video:

20

Q.   Okay.  At that time did, was there anything that, I noticed that in the video, I'm not exactly sure which time, so please clarify if, if, you know or correct me if I'm wrong here, but you stated that you told him that it, you're not my fit.  What did you mean by that?

A.   He not my, you not my age.  Like –

Q.   Okay.

A.   - you grown.

Q.   Okay.  So it had to do with his age?

A.   It's not really about the age either, it's just about, you know, you, why you want to mess with a child?

The victim estimated that the first and second incidents of sexual intercourse lasted "[m]aybe an hour or two" or even three.  The victim then stated that she honestly did not know how long the intercourse lasted but agreed that it was somewhere between one and two hours.  As for the third and fourth incidents, the victim did not remember where they occurred but remembered that they were instances of actual intercourse that lasted about the same as the others.  The fifth (last) incident, the victim testified, occurred by the school.

When asked if she did not tell anyone what was happening because she was afraid of getting in trouble or afraid of telling her mother the truth, the victim replied, "I was more afraid of getting myself in trouble."  The victim denied admitting to anyone that the allegations were false.  Finally, the victim testified that she did not make up these allegations.

On re-direct, the state concluded the victim's testimony with the following colloquy:

Q.   Okay.  Everything that you said in the video, you stand by those statements?

A.   Yes, sir.

Q.   Everything you said here in court, every single thing, you stand by those statements?

21

A. Yes, sir.

Q. The whole time, you telling the truth?

A. Yes, sir.

Q. Your godfather had sex with you five times?

A. Yes, sir.

Q. One time when you were twelve?

A. Yes, sir.

The victim's mother, A.J., testified that the victim was afraid to talk to her about what happened even after she was notified about the victim's chlamydia infection. When A.J.'s other daughter spoke with the victim, the victim began to cry and talk to A.J. about who did this to her. A.J. denied ever trying to drop the charges against the defendant.

The victim's stepmom, T.C., testified that she was present at times when the victim was on the phone with the defendant. When asked how she knew the victim was on the phone with the defendant, T.C. testified that the conversation would get quiet, and the defendant would ask the victim if anyone was around. According to T.C., the victim was eleven or twelve years old when these conversations took place, and the victim acted secretive and private.

When asked if the defendant ever made her an offer to drop the charges, T.C. responded:

A. Yes, sir. And it was like, it was like twenty-five, something like that.

Q. Twenty-five?

A. Hundred.

Q. Twenty-five hundred dollars?

A. Yes, sir.

22

T.C. testified that she told the defendant "no." Although she could not say what they asked her, T.C. stated that she was contacted by another person associated with the defendant. T.C. described their contact with her "like bribery."

On cross-examination, T.C. testified that before the allegations were made, she asked the defendant if he was sexually involved with her daughter. When asked why she asked that question, T.C. replied, "Because of the conversations I was overhearing." Although T.C. stated she did not hear anything of a sexual nature, she was suspicious of why the defendant asked the victim if anyone was around.

After the state rested its case, the defendant introduced one witness, the defendant's aunt, Gwendolyn Gatson. Ms. Gatson testified that she was friends with the victim's mom, A.J., and testified that she had known the victim since she was a baby. Ms. Gatson testified that A.J. confided in her when A.J. learned what happened to the victim. Ms. Gatson described A.J. as being devastated and crying. According to Ms. Gatson, the victim and her mom have continued to attend Gatson family functions even after the allegations. When asked if she believed the allegations, Ms. Gatson replied, "No, sir." Finally, Ms. Gatson testified that there were no abandoned houses across the street or down the street from the defendant's mom's house.

## Defendant's Argument in Brief

The defendant argues the state failed to prove beyond a reasonable doubt that intercourse occurred before the victim's thirteenth birthday. Thus, the defendant contends the jury should have found him guilty of carnal knowledge of a

juvenile, not first degree rape.[2]  The defendant claims there was no clear evidence

that the victim was twelve when one of the incidents of sexual intercourse occurred

and claims the victim's testimony was vague and inconsistent as to this issue.  The

defendant points out that the victim told the CAC interviewer that she did not

remember when the first incident happened.  Additionally, the defendant notes that

when the interviewer asked the victim how old she was, the victim responded "it

wasn't even long ago[,]" and "it was in 2019."  The defendant acknowledges that

when the interviewer specifically asked the victim if the intercourse happened

before or after her birthday, the victim responded "before . . . one time."  The

defendant contends, however, there was no consistent testimony regarding a

precise date.  The defendant asserts the state offered no corroboration of the

victim's claim that one incident of intercourse occurred before her thirteenth

birthday, offered no evidence that the defendant had a venereal disease, and offered

no evidence that the victim's boyfriend was tested for infection.

*State's Argument in Brief*

Citing *State v. Hypolite*, 13-1365 (La.App. 3 Cir. 5/14/14), 139 So.3d 687,

*writ denied*, 14-1242 (La. 1/23/15), 159 So.2d 1056, the state asserts the well-

settled principle that "a victim's testimony alone is sufficient to support a verdict

as long as that testimony is believed by the trier of fact and that testimony does not

contain internal contradictions or irreconcilable conflicts with physical evidence."

The state further asserts:

> It is the jury that weighs the testimony and evidence presented.
> The jury heard that the victim, J.B., was born on August 25, 2006.
> Prior to August 25, 2019, J.B. is twelve years old.  The jury heard the
> school nurse testify that J.B. tested positive for chlamydia in October

---

[2]The defendant was found guilty of first degree rape and carnal knowledge of a juvenile. The defendant does not challenge the sufficiency of the evidence of his conviction for carnal knowledge of a juvenile.  Thus, it appears the defendant is arguing that he should have been found guilty of two counts of carnal knowledge of a juvenile rather than one count of first degree rape and one count of carnal knowledge of a juvenile.

of 2019. The jury heard that J.B. celebrates her birthday while she is in school. The jury heard that J.B. testified that the "first event" occurred during the summer. The jury heard J.B. testify that it happened before school. The evidence is sufficient to support that J.B. was twelve years old at the time she was first raped by the defendant.

*Discussion*

The supreme court stated the following regarding the sufficiency of the evidence when the victim's testimony was the only evidence to support the offense:

> E.S.'s second argument is that the State presented no medical, eyewitness, or other direct evidence to corroborate N.H.'s claims. Testimony of a sexual assault victim alone is sufficient to support a rape conviction, even if the State does not introduce medical, scientific, or physical evidence to prove that the defendant was the individual who committed the crime. *See State v. Rives*, 407 So. 2d 1195, 1197 (La. 1981) ("Despite the absence of scientific evidence of sexual intercourse, the testimony of the victim was sufficient to establish 'sexual penetration' "); *State v. Ponsell*, 33,543, p. 5 (La. App. 2 Cir. 8/23/00), 766 So. 2d 678, 682, *writ denied*, 00-2726 (La. 10/12/01), 799 So. 2d 490 (finding that testimony of the victim is sufficient even where no medical or physical evidence is introduced); *State v. Lilly*, 12-0008 (La. App. 1st Cir. 9/21/12), 111 So. 3d 45, 62, *writ denied*, 2012-2277 (La. 5/31/13), 118 So. 3d 386 (victim's testimony was sufficient even where contradicted by testimony of defendant); *see also State v. Ford*, 28,724 (La. App. 2 Cir. 10/30/96), 682 So. 2d 847, 849–50 (finding that, absent internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion.).

> It is true that in the instant case the only direct evidence of the sexual abuse was the testimony of N.H., but, as the foregoing jurisprudence indicates, a victim's testimony alone is sufficient to pass *Jackson* muster, even if there is contradictory evidence presented. *See, e.g.*, *Lilly*, 111 So. 3d at 62. It is notable in this case that the judge indicated that the forensic interview of N.H. was "one of the better ones [he had] seen over [his] career" and was thoroughly convinced that N.H. was being truthful in her testimony. We defer to the district court judge as the factfinder to give great weight to victim's testimony, particularly in light of such express findings of credibility.

*State in the Interest of E.S.*, 18-1763, p. 15 (La. 10/22/19), 285 So.3d 1046, 1057–58 (footnote omitted).

We find that in the present case, the victim's testimony alone was sufficient to prove that she was under the age of thirteen at the time of the first incident of sexual intercourse. The victim stated that one incident happened during the summer and before her birthday (August 25, 2006). When asked if she celebrated her birthday before she went back to school or during school, the victim testified that she celebrated her birthday during school. The victim agreed that the first incident happened during the summer, before school. At trial, the victim replied, "Yes, sir[,]" when asked if one of the incidents occurred when she was twelve. On cross-examination, the victim stated the first incident occurred in July. Subsequently, the victim stated the first occurrence took place sometime between July and August. Another time during cross-examination, the victim attributed the discrepancy in the amount of money she claimed the defendant gave her after the first incident to her being young and "only twelve years old." Finally, at the conclusion of her redirect-examination, the victim answered "Yes, sir[,]" when asked if she was telling the truth, if her godfather had sex with her five times, and if one of the times was when she was twelve.

We find the victim's testimony did not conflict with physical evidence. Even though there were some inconsistencies between the victim's testimony at trial and her earlier statements, the victim offered an explanation for the inconsistencies. Obviously, the jury believed the victim's testimony, and the jury's credibility determination was reasonable. Since the victim's testimony was sufficient to establish that at least one incident of sexual intercourse occurred prior to her thirteenth birthday, we find the evidence was sufficient to convict the defendant of first degree rape.

We note the defendant cites *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000), and raises an issue in this assignment of error as to the jury's

26

failure to make a specific finding that the victim was under thirteen years old at the time of the offense of first degree rape. The jury was instructed that it must find the victim was under thirteen years old in order to find the defendant guilty of first degree rape. The verdict form did not require the jury to specifically find the victim was under thirteen years old.

The defendant's reliance on *Apprendi* is misplaced in this assignment of error. In *Apprendi*, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. The fact of the victim's age in this case did not increase the penalty for first degree rape beyond the statutory maximum. Rather, the victim's age was an essential element of first degree rape. Thus, by finding the defendant guilty of first degree rape, the jury obviously found the victim was under the age of thirteen.

For the foregoing reasons, this assignment of error lacks merit.

## ASSIGNMENT OF ERROR NUMBER TWO

The defendant argues the trial court erred in restricting his cross-examination of the credibility of the victim under the rape shield statute. In his argument, the defendant does not specify the ruling about which he is complaining. First, the defendant cites a portion of the victim's CAC interview wherein the victim stated that she remembered the interview room. The defendant claims the trial court prevented defense counsel from asking about the victim's memory of the interview room and asking whether the victim had given false statements in the past. Defense counsel, however, cites to no such question in the record. Thus, we find the defendant's argument does not meet the requirements of Uniform Rules—

27

Courts of Appeal Rule 2-12.4(A)(9)(a).  Accordingly, we will not consider this argument.

Next, the defendant refers to a portion of the school nurse's testimony wherein she testified the victim told her she had sex only with her boyfriend.  The defendant argues:

> When counsel brought up that statement and inquired about it on cross examination, the State objected, claiming the law as barring "inquiry regarding anybody else." (Rec. Vol. 1 p. 206)  The Court applied the part of Article 412 limiting prior activity to a short time before the charged offense:
>
> However, in this case the accuser had made statements that showed a pattern of false content, particularly about her boyfriend being her partner.  The courts have noted a difference in impeachment of credibility and delving into sexual activity.
>
> This Honorable Third Circuit, has held, citing the Supreme court, that "La. Code Evid. art. 412 does not apply to cases wherein the defense seeks to introduce prior false allegations of sexual misconduct for purposes of discrediting the victim in *State v. Smith*, 98-2045, (La. 9/8/99), 743 So.2d 199"; *State v. K.W.T.*, 2012 La. App. Unpub. LEXIS 322, *26-28, 11 839 (La.App. 3 Cir. 05/16/12), 2012 WL 2213675.
>
> "Because the outcome of this case rested entirely upon the jury's perception of the victim's veracity, the trial court's ruling regarding the victim's prior false allegations of sexual molestation cannot be said to be harmless" *State v. Smith*, 743 So. 2d 199, 203-204, 1999 La. LEXIS 2228, *14-15, 98-2045 (La. 09/08/99).  Smith is precisely on point in this case.
>
> In this case, J.B. is the sole witness.  She earlier pointed to her boyfriend, after initially denying any sexual activity.  She gave various accounts of the timing and sometimes stated she did not remember.  The trial court erred in preventing the jury from considering her changing accounts with prior allegations that were possibly false, or that actual[ly] accused a different person.  Her prior experience in the interview room is a missing link to proof beyond a reasonable doubt, and affirmation of the conviction violates the United States and Louisiana Constitutions.

The only objection cited in the above excerpt from the defendant's brief was an objection made on page 206 of the record.  Although we find no objection on

28

page 206, we note the following discussion on page 208, which occurred during defense counsel's questioning of Ms. Ducote, the school nurse:

Q.    Do you remind, do you recall asking Ms. [J.B.] about her past sexual history on nine twenty-five, twenty nineteen?

MR. HALL:    Your Honor, may we approach, please?

SIDEBAR NOT RECORDED

THE COURT:    Mr. Stephens, if you would continue with your cross.

Since the bench conference referred to in the above colloquy was not recorded, it is unclear what objection and/or ruling, if any, was made. It is clear from defense counsel's subsequent questioning, however, that he was allowed to question the school nurse about the victim's reported sexual history:

BY MR. STEPHENS:

Q.    So do you recall asking Ms. [J.B.] about her sexual history on nine twenty-five of twenty nineteen?

A.    I do not.

Q.    Based on the medical records do you see that that question was asked by, by, by you?

A.    No, sir, I did not ask her.

Q.    Based on the medical records was that questioned [sic] asked?

A.    No, sir.

Q.    Do you recall asking Ms. [J.B.] about her sexual history on ten twenty-five of nineteen?

A.    Yes, that's part of the wellness visit.

Q.    According to the medical notes isn't it true that [J.B.] denied have, to, to have had sex the twelve months prior to that date?

A.    That's true.

Q.    Do you remember ask [sic], or do you recall asking Ms. [J.B.] about her sexual history that day?

29

A.    Yes.

Q.    Do you remember her denying it?

A.    Yes, she was not sexually active.

Q.    Okay.  So that's what she states, she was not –

A.    That's what she –

Q.    - sexually –

A.    - stated.

Q.    - active?  Okay.  What was significant about the, looks like the October twenty-fifth, twenty nineteen visit that warranted a notation of [J.B.'s] sexual history, but it did not warrant a, a notation in the previous one?

A.    Because it's a wellness visit, and we go by those questions.  As a thirteen year old I, I don't ask every visit if they're sexually active, twelve and

Q.    Um-hmmm (affirmative).

A.    - thirteen.

Q.    During the, I guess the, the October twenty-ninth, twenty nineteen visit it was reported that [J.B.] had been sexually active within twelve months prior, correct?

A.    Well, due to the, the lab report.  She didn't verbalize she was sexually active.

Q.    Okay.  Let's skip to the, the next time you saw [J.B.] on the ten twenty-nine, twenty nineteen.

A.    Okay.

Q.    Isn't it true that [J.B.] told you –

A.    Um-hmmm (affirmative).

Q.    - that she had been sexually active with her boyfriend?

A.    Correct.

Q.    Isn't it also true that [J.B.] told you that she had only had one sexual occurrence and that was with her boyfriend?

30

A. Correct.

Q. Your notes also shows [sic] that the sexual occurrence happened approximately two months prior to ten twenty-nine, twenty nineteen, based on what she's told you, correct?

A. Correct.

Q. Would you agree that this would have been approximately sometime around August of twenty nineteen, two months prior?

A. That's two months before October, so, yes.

. . . .

Q. Okay. So based on your examination and your conversation with [J.B.], -

A. Um-hmmm (affirmative).

Q. - you under, after the, you, you ended the conversation with her you understood that she had had only one sexual partner, and it was what she called her, with her boyfriend around August twenty nineteen, correct?

A. That is what she told me.

Despite not knowing what objection, if any, was made in the bench conference prior to the above colloquy, it is clear that defense counsel questioned the school nurse about what the victim reported as her sexual history.

Although not specifically mentioned by defense counsel in brief, we note that during defense counsel's cross-examination of the victim, the following colloquy and objection took place regarding the victim's statement to the school nurse:

Q. Okay. Who was your, did you have a boyfriend at that time?

A. Yes, sir.

Q. What was his name?

A. [J.B.][3]

---

[3] We have redacted the full name of the minor child identified by the victim.

31

. . . .

Q.  Well, do you know how, don't worry about that question.  How long had you and [your boyfriend] been dating?

> MR. HALL:  Objection.
>
> THE COURT:  Grounds?
>
> MR. HALL:  Four twelve.
>
> MR. STEPHENS: Your Honor, I'm not going to go that far.
>
> MR. HALL:  Judge, it seems that –
>
> THE COURT:  Sustain that because I've already had that, sustained.  She can't, not allowed to answer that question.

Defense counsel then asked the victim if her mother knew that she was dating, and the victim responded, "Yes, sir."

The trial court's statement that it had already sustained that objection may have come from an earlier objection and ruling during trial.  The state made the following objection:

> MR. HALL:  Yes, sir.  This comes out of remarks made during defense's opening statements.  And Mr. Stephens made reference to [J.B.'s] sexual, possible sexual contact with another individual, not the accused, not Mr. Christopher Gatson.  And I've asked the Court to take a look at article, Code of Evidence, article 412 where it says that wherein an accused is charged with a crime involving sexually assaultive behavior, reputation or opinion evidence of the past sexual behavior of the victim is not admissible, as in absolutely not admissible.  When an accused, under paragraph two, when an accused is charged with a crime involving sexually assaultive behavior evidence of specific instances of the victim's past sexual behavior is also not admissible except, paragraph A talks about trying to find what the source of DNA is.  There is no DNA in this case, and it could not possibly apply.  And the other has to do with past sexual contact between the accused and the victim to whether consent is an issue.  And I doubt Mr. Stephens wants to make use of that paragraph as he is denying all sexual contact with Ms. [J.B.] whatsoever.  Accordingly, all of his statements about any past sexual contact, contact with any other person were entirely inappropriate.  There is evidence in the case where my victim said her boyfriend, but there was no other identifying information as to that.  The Court correctly

32

shut him down on a speculative argument, but his suggesting these things in front of the jury needs to be stopped. I'm asking the Court for an order that he make no further reference to this whatsoever. If he wants to find out what she meant by the word boyfriend, I think that that is a fair question to ask to my victim, but I do not think it is fair for him to say have you had sex with somebody else, as that is entirely inadmissible.

THE COURT: Any response, Mr. Stephens?

MR. STEPHENS: Your Honor, we're not, at this, we're not asking about her. We're not referencing any of her reputation or her, her opinions or anything like that concerning any sexual allegation. What we're trying to say here is that there could have been potentially another source. And she stated in her records that, that there was another source. And so I don't under, well, I don't see that the idea that we asked her about things that she stated should be admissible in this case, because this is exactly what she said. She said that I had sex with another person.

MR. HALL: And, Judge, the problem with the argument and why it's patently false is because she doesn't identify who the boyfriend is. She doesn't make anything about, any identifying information whatsoever. And it is entirely reasonable to assume that she was talking about Mr. Gatson. And so his argument discounts the problem with that. And where he's trying to put his foot down firmly, he cannot. And he clearly said there was a boyfriend who was another source for the chlamydia, which is entirely not permitted by this code. I don't want the Court to make an instruction to disregard his argument as I think that would prejudice me even more. What I'm merely requesting is that the Court stop Mr. Stephens from any further inquiry into Ms. [J.B.'s] past sexual contacts with anybody else. I think it is fair, because the statement boyfriend is in the record, that he can ask her what boyfriend meant, but beyond that it's not admissible.

MR. STEPHENS: Judge, this, this article apply [sic], it restricts the introduction of evidence related to her behavior and her reputation. But in, in this case, this, this whole incident started with the results of a, of an STD test. So it's a factual issue how she could have gotten this STD if, if she had not had sex with any other person or not had sex at all. So that, it's really a factual issue rather than, than an opinion or a reputation question.

. . . .

THE COURT: - part two is that, when the accused is charged with a crime involving sexual assault and behavior. That's what we're going to have here. Evidence as specific instances of the victim's past sexual behavior shall, is not admissible. Stop there. Except, well, two exceptions. Evidence of past sexual behavior with persons other than the accused upon the issue of whether or not the

accused was the source of the semen or injury. That would go towards any kind of testing to determine whether there was somebody other than Mr. Gatson, provided that the limit of the period is up to seventy-two hours prior to the time of the offense. Other one is other exception, is evidence of past sexual behavior with the accused offered by the accused upon the issue of whether or not the victim consented. As far as like Mr. Hall stated, part B, would probably not be the issue because that would come from the defense side from Mr. Gatson point of view. So we go back up to the A, is the only exception of allowing it and with persons other than the accused of which the alleged is boyfriend or somebody else, upon the issue of whether or not the source of the semen or the injury. And it's only limited to not to exceed seventy-two hours prior to the time of the offense. So you've got some hurdles there that prior to the time or prior to the offense, if you specify the date of the offense, I think it's in the, that hasn't been specified. I think the Court, at this time, is not allowing any of that questioning because those conditions have not been met, which could be later on down the road if it's met. Then it could possibly allow for further questioning of others. But until that condition's met, that line of questioning will not be allowed, other than to identify that the, of the, the word boyfriend.

MR. HALL: Judge, if I'm understanding you, you've shut down the questioning and you've used that, that word repeatedly, but does that also apply to arguments and other references within the hearing of the jury on this issue?

THE COURT: Yes. I mean, questions would go to information. You can't ask the question and, you don't ask the question then withdraw it because I'm going to consider that to be a violation of what the spirit of my ruling is, is that no information about behavior other than trying to identify what the boyfriend word's supposed to be, because it already has been brought up by the victim in this matter.

MR. STEPHENS: To be clear, Your Honor, you're, you're stating that I cannot ask any questions dealing with her sexual past at this point?

THE COURT: At this point, no, because part B has not been satisfied.

MR. STEPHENS: Please note our objection for the record, Your Honor.

The trial court's ruling as to the applicability of La.Code Evid. art. 412 prohibited defense counsel from questioning the victim as to her sexual past unless

34

the conditions of Article 412 were met.  Louisiana Code of Evidence Article 412 provides, in pertinent part:

> **A.(2) Other evidence; exceptions.** When an accused is charged with a crime involving sexually assaultive behavior, evidence of specific instances of the victim's past sexual behavior is also not admissible except for:
>
> (a) Evidence of past sexual behavior with persons other than the accused, upon the issue of whether or not the accused was the source of semen or injury; provided that such evidence is limited to a period not to exceed seventy-two hours prior to the time of the offense, and further provided that the jury be instructed at the time and in its final charge regarding the limited purpose for which the evidence is admitted; or
>
> (b) Evidence of past sexual behavior with the accused offered by the accused upon the issue of whether or not the victim consented to the sexually assaultive behavior.

The defendant offers no argument in brief that either one of the conditions of Article 412 were met in this case.  Rather, as stated earlier, the defendant appears to focus on the victim's statement during the CAC interview that she remembered the interview room.  The defendant states in brief that the victim's prior experience in the interview room is the "missing link" to proving reasonable doubt.  However, defense counsel fails to point to any portion of the trial record wherein he attempted to question the victim about remembering the CAC interview room.  Not only does the defendant's brief violate Uniform Rules—Courts of Appeal Rule 2-12.4(A)(9)(a) (by failing to point to any portion of the record wherein he requested to question the victim about her prior experience in the interview room), it also appears that defense counsel failed to preserve this issue for review.  La.Code Crim.P. art. 841.

In its response to this argument, the state acknowledges that La.Code Evid. art. 412 "does not apply when a defendant attempts to use evidence of a victim's false allegations of improper sexual behavior to impeach the victim's credibility.

*State v. Smith*, 98-2045 (La. 9/8/99), 743 So.2d 199, 202-03." The state distinguishes *Smith* from the present case by noting that the victim in *Smith* admitted to making prior accusations of improper sexual behavior, and the admission was corroborated by two witnesses. Additionally, the state notes, one witness in *Smith* testified that the victim recanted the accusations. Unlike *Smith*, the state argues, there was no evidence in this case that J.B. retracted or recanted prior allegations of abuse. In fact, the state notes there was no evidence that the victim made prior allegations of improper sexual behavior.

Although it appears the defendant is alluding to the possibility that the victim's familiarity with the CAC interview room was because of a prior allegation of improper sexual behavior, there was no evidence of such a prior allegation. Thus, the defendant has failed to show any error in the trial court's ruling.

For the foregoing reasons, this assignment of error lacks merit.

## ASSIGNMENT OF ERROR NUMBER THREE

In his final assignment of error, the defendant argues the trial court erred in denying discovery based on the fact that no bill of information had been filed. Because the defendant was incarcerated and unable to post bond, defense counsel claims his confrontation and due process rights were violated. According to defense counsel, no provision of the Code of Criminal Procedure limits defense discovery to after a formal charge has been filed. Although defense counsel concedes that "the error here, sheltered by the 'harmless error rule' does not so far rise to the level of reversal[,]" defense counsel contends this court "should not countenance such a flagrant disregard of the right to discovery . . . ."

In response, the state argues:

> Noncompliance with discovery procedures will not mandate reversal if the defendant has not been prejudiced. *State v. Mitchell*, 412 So.2d 1042 (La.1982); *State v. Vaccaro*, 411 So.2d 415

(La.1982); *State v. Roussel*, 381 So.2d 796 (La.1980); LSA–C.Cr.P. Art. 921. The Appellant writes in his brief that he "concedes that the error here, sheltered by 'harmless error rule' does not so far rise to the level of a reversal." The defendant has not shown how the denial of defendant's discovery motion has prejudiced the defendant to any degree. In the event the trial court made error as this issue, the error was harmless and no prejudice has been shown by the defendant at the pretrial, trial, or appellate stage.

*Analysis*

Louisiana Code of Criminal Procedure Article 729.6 provides:

> The rules of this Chapter shall be applied in all criminal cases tried in the district, parish, and city courts. They shall be applicable following the institution of prosecution by the return of a grand jury indictment, the filing of a bill of information, or the filing of an affidavit charging an offense. However, the rules of this Chapter do not apply in city and parish courts to cases in which prosecution is instituted by affidavit for violations of city or parish ordinances defining traffic offenses.

In *State v. Jefferson*, 09-740 (La. 4/2/09), 6 So.3d 757, 758, the supreme court stated: "The Commissioner's order allowing defendant to review the police report is Reversed. Defendant has not been indicted or charged by bill of information with an offense, thus any request for production of the police report is premature. La.C.Cr.P. art. 729.6."

In *State v. Parkerson*, 530 So.2d 94 (La.1988), the supreme court held:

> The request for production of tapes is premature. We have been advised that relator has not been indicted or charged by bill of information with an offense. La.Code Crim.P. art. 729.6. If relator is indicted or charged by bill of information, then he would be entitled to production of the tapes in accordance with La.Code Crim.P. arts. 716 and 718.

*See also State v. James*, 530 So.2d 94 (La.1988).

In *State v. Palermo*, 14-1099 (La.App. 3 Cir. 11/14/14) (unpublished opinion), *writ denied*, 14-2622 (La. 3/6/15), 160 So.3d 1288, Palermo was under investigation but had not been arrested or indicted. He filed a motion for

production of two search warrant affidavits, which was granted by the trial court. The state sought review of the trial court's ruling, and this court held:

> **WRIT GRANTED AND MADE PEREMPTORY:** Search warrant affidavits are not public records, and discovery is available only after the institution of criminal proceedings by the filing of an indictment or a bill of information. *See* La.R.S. 44:3; La.Code Crim.P. art. 729.6. *Cf. State v. Jefferson*, 09-740 (La. 4/2/09), 6 So.3d 757; *State v. Parkerson*, 530 So.2d 94 (La.1988); *State v. James*, 530 So.2d 94 (La.1988). Accordingly, the trial court's ruling on September 19, 2014, granting access to the search warrant affidavit is reversed.

In *State in Interest of E.D.*, 14-754 (La.App. 3 Cir. 7/24/14) (unpublished opinion), the juvenile was alleged to have committed two counts of forcible rape and one count of sexual battery. Prior to the filing of a petition charging the juvenile, the trial court ordered the state to respond to the juvenile's discovery motion. The state filed a writ application, and this court held:

> **WRIT GRANTED AND MADE PEREMPTORY:** The trial court erred in granting the Juvenile's motion for discovery in absence of the filing of a petition, bill of information, or indictment. La.Code Crim.P. art. 729.6. We vacate the trial court's ruling and remand for proceedings in accordance with this ruling.

Considering the above, we find the defendant fails to show the trial court erred in denying his discovery request prior to the filing of an indictment in this case. Furthermore, as the defendant concedes, any error would be harmless in light of the lack of a showing of prejudice. Although the defendant claims he was prejudiced by the loss of liberty, the defendant must show that the alleged discovery violation "'undermine[d] confidence in the outcome of [his] trial.'" *State v. Carter*, 10-614, p. 33 (La. 1/24/12), 84 So.3d 499, 524 (quoting *State v. Walter*, 96-1702, p. 1 (La. 6/20/97), 695 So.2d 1340, 1340), *cert. denied*, 568 U.S. 823, 133 S.Ct. 209 (2012). No such showing has been made.

Accordingly, this assignment of error lacks merit.

## CONCLUSION

The defendant's convictions and sentences for first degree rape and carnal knowledge of a juvenile are affirmed.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2-16.3.